**In re NextWAVE PERSONAL COMMUNICATIONS, INC., et al., Debtors.**

**NextWave Personal Communications, Inc., Plaintiff,**

**v.**

**Federal Communications Commission, Defendant.**

**Bankruptcy No. 98 B 21529(ASH).**
**Adversary No. 98–5178A.**

United States Bankruptcy Court, S.D. New York.

Dec. 7, 1998.

**Andrews & Kurth L.L.P.**, By Deborah L. Schrier–Rape, Dallas, TX, for plaintiff/debtor.

Mary Jo White, United States Attorney for the Southern District of New York, By Daniel S. Alter, New York City, for defendant.

## REVISED DECISION ON MOTION TO DISMISS

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Defendant Federal Communications Commission ("FCC") has moved to dismiss this adversary proceeding for lack of subject matter jurisdiction.[1]

The First Amended Complaint of plaintiff-debtor NextWave Personal Communications, Inc. ("NextWave" or the "debtor") contains two causes of action. The first alleges that NextWave's transfers to the FCC of deposits and secured promissory notes aggregating $4.7 billion in exchange for conditional grants of 63 C block lines on January 3, 1997 were constructive fraudulent conveyances subject to avoidance under 11 U.S.C. § 544. The second cause of action alleges that, by reason of the FCC's *de facto* control over NextWave and its "inequitable, unconscionable and unfair conduct" from the time of the C block auctions through the conditional grant of licenses on January 3, 1997, the FCC's liens and claims should be equitably subordinated to the claims of other creditors in the case, including inter-company and affiliate claims.

The motion to dismiss will be denied as to the first cause of action and granted as to the second. As amplified below, the first cause of action arises solely out of the FCC's status as a creditor of NextWave and does not seek to challenge any act or omission of the FCC or to affect the FCC in any manner except in its capacity as a creditor. By contrast, the second cause of action is based upon conduct of the FCC acting in its regulatory capacity. This Court will decline to review or adjudicate the consequences of the FCC's acts and omissions in matters over which Congress has granted the FCC primary jurisdiction.

### *Jurisdiction*

This Court has jurisdiction over the debtor's Chapter 11 case by reason of 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward. This Court's jurisdiction with respect to the claims asserted in the adversary proceeding is the subject of this decision.

### *Background*[2]

As set forth in the FCC's main memorandum, prior to Congress' enactment of Section 309(j) of the Federal Communications Act ("FCA"), the House Committee on Energy and Commerce (the "Committee") recognized that the radio frequency

---

1. The District Court denied the FCC's companion motion to withdraw the reference, remanding the motion to dismiss to this Court for decision.

2. The facts set forth below are drawn from the parties' briefs and the First Amended Complaint. The factual recitation which follows does not constitute "findings of fact" but is intended to provide the factual matrix giving rise to the parties' dispute in order to give context for the decision below. While the parties may differ on particular points of fact referred to herein, it is the Court's view that such differences would not be material to the ultimate factual and legal issues presented on this motion to dismiss.

spectrum is a "precious but limited resource [that] has become vitally important to our economic success and social well being." *See* H.R.Rep. No. 103–11 at 247–48 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 574–75. Noting that the congested state of the radio frequency spectrum limited the ability to accommodate new spectrum-dependent technologies and that existing procedures for issuing radio spectrum licenses by lottery and comparative hearings had resulted in regulatory inefficiencies and permitted licensees to exploit a national resource unjustly, the Committee concluded

> that a carefully designed system to obtain competitive bids from competing qualified applicants can speed delivery of services, promote efficient and intensive use of the electromagnetic spectrum, prevent unjust enrichment, and produce revenues to compensate the public for the use of the public airwaves.

*Id.* at 580.

In section 309(j) of the FCA Congress authorized the FCC to issue radio spectrum licenses to various categories of qualified applicants through a system of competitive bidding. 47 U.S.C. § 309(j)(1), (2). Among the categories of applicants, the FCC was directed by the statute to designate portions or "blocks" of the radio spectrum for auction to small, emerging businesses and to establish flexible, deferred license payment plans to enable such enterprises to participate in the communications industry. 47 U.S.C. § 309(j)(3)(B) and (4)(D). Consistent with this mandate, the FCC designated the C block for auction to small businesses providing Personal Communications Services ("PCS"), a new form of wireless communication technology.

On May 6 and July 16, 1996, the FCC conducted its C block auctions, in which some 90 bidders won the right to apply for 493 C block licenses at bid prices aggregating $10.2 billion. As mandated by the statute, successful bidders were obligated to pay 10% of their winning bids in cash

and to pay the remaining 90% to the FCC in deferred installments. Consistent with the statutory mandate, the FCC enacted regulations authorizing payment of the remaining 90% over a period of ten years, with interest only for the first six years and principal and interest for the remaining four years. 47 C.F.R. § 24.711(b)(3). Below-market interest rates were provided to enable start-up companies to obtain financing through capital markets or private placement in order to make debt payments to the FCC and to "build out" their PCS networks.

NextWave is a start-up company organized to take advantage of the opportunities provided by section 309(j) in the fledgling PCS industry. NextWave was high bidder for a total of 63 C block licenses for amounts aggregating approximately $4.7 billion. As required, NextWave made 10% downpayments aggregating some $474 million. In late May and late July 1996, following the auctions in those months, NextWave submitted applications for the C block licenses upon which it was the winning bidder for review and approval by the FCC.

On September 17, 1996, C block licenses were granted to over 90% of the parties who had earlier been designated as making high bids for licenses in the C block. The FCC did not grant approval for NextWave's 63 C block licenses until January 3, 1997. Shortly thereafter, NextWave received from the FCC a series of promissory notes made payable to the FCC (the "Notes") aggregating $4.26 billion, representing the remaining 90% of the amount bid by NextWave for its C block licenses. NextWave executed the Notes on February 19, 1997.

On June 26, 1996 the FCC announced the date for commencement of the D, E and F block auctions, which were held on August 26, 1996 and concluded in January 1997. These blocks covered geographical areas across the country, including areas covered by the 63 C block licenses for

which NextWave was awaiting FCC approval. The winning bids on the D, E and F block auctions were at a fraction of the winning bids in the C block auction.[3] The drastic devaluation in the C block licenses, as reflected in the values of the subsequently bid D, E and F block licenses, is the central factor in the NextWave bankruptcy filing and in the debtor's adversary proceeding against the FCC.

As a consequence of the gross disparity between the values of the C block licenses and those of the D, E and F block licenses, many if not most or all of the C block licensees experienced great difficulty in obtaining necessary financing. As stated in the FCC memorandum:

> In early 1997, the FCC received several requests from C block licensees for relief from their installment payments that described a range of difficulties in accessing the capital markets.... The FCC's Wireless Telecommunications Bureau ("Wireless Bureau") also received several proposals from C block licensees regarding alternative financing arrangements, as well as a petition for rulemaking regarding C block installment payments. In response to these requests, the FCC suspended the C block installment payments indefinitely, and initiated an elaborate administrative process for restructuring the C block license obligations.

After issuing public notice seeking comments, receiving over 160 filings in response, conducting a public forum in Washington, D.C. and reviewing further submissions thereafter, on October 16, 1997 the FCC issued a "Restructuring Order" which provided distressed C block

licensees with four distinct, mutually-exclusive options regarding financial relief for C block licensees. In response to the Restructuring Order, the FCC received numerous petitions for reconsideration, oppositions, replies and *ex parte* filings. On March 24, 1998 the FCC issued a "Reconsideration Order," in which the FCC left intact the basic framework of the Restructuring Order, modifying it only slightly to allow licensees somewhat more flexibility in making their choices available under the Restructuring Order. The Restructuring Order and the Reconsideration Order are referred to collectively as the "Restructuring Orders."

On May 8, 1998 NextWave petitioned the FCC for further reconsideration of the Restructuring Orders, and on May 29, 1998 NextWave filed a petition for review of the Restructuring Orders with the District of Columbia Circuit Court. NextWave asked both the FCC and the Circuit Court for a stay of the June 8, 1998 deadline for its election of one of the four alternatives provided in the Restructuring Orders. Both the FCC and the Circuit Court denied NextWave's requests for stay of the June 8 deadline.

On June 8, 1998 NextWave filed its Chapter 11 petition together with the complaint in this adversary proceeding.

### Discussion

The basic legal principles of jurisdiction governing the outcome of this motion are established by statute and are not controversial.

■ Congress has vested in the Circuit Courts of Appeals exclusive jurisdiction to

---

3. The C, D, E and F block radio spectrum licenses were allocated in specifically identified geographical areas, referred to as "Basic Trading Areas" ("BTAs"). A significant factor in the value of PCS licenses is the population or number of people served by the license, referred to colloquially as "Pops." Another variable in the value of a license is the carrying capacity of the wireless spectrum covered by the license, expressed in number of megahertz ("MHZ") of radio frequency. The price paid for a license can be quantified in terms of dollars per MHZ per Pops, or $/MHZ–Pops. NextWave bid an average of $1.43/MHZ–Pops for the 63 C block licenses for which it was high bidder. By contrast, the winning bids for the D, E and F block auctions reflected an average value of approximately $.35/MHZ–Pops for D and E block and $.246/MHZ–Pops for F block licenses.

enjoin, set aside, annul or suspend orders of the FCC. 28 U.S.C. § 2341(1) and 47 U.S.C. § 402. *See FCC v. ITT World Comms., Inc.*, 466 U.S. 463, 468, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984); *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396 (9th Cir.1996); *Media Access Project v. FCC*, 883 F.2d 1063, 1066 (D.C.Cir.1989); *Bywater Neighborhood Ass'n v. Tricarico*, 879 F.2d 165, 167 (5th Cir.1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 474 (1990). The regulatory jurisdiction conferred by Congress on a Federal agency and the grant of exclusive jurisdiction to the Circuit Courts to review the agency's actions precludes a district court (or, by reference, a bankruptcy court) from enjoining, reviewing, assessing damages for or otherwise adjudicating the consequences of the conduct of the Federal agency acting within the scope of its Congressional mandate. *See, e.g., FCC v. ITT World Comms., Inc.*, 466 U.S. at 468, 104 S.Ct. 1936 ("[l]itigants may not evade these [jurisdictional] provisions by requesting the District Court to enjoin action that is the outcome of the agency's order"); *Dougherty v. Carver Federal Savings Bank*, 112 F.3d 613, 620 (2d Cir.1997) ("Where Congress has vested exclusive review of an agency action in the court of appeals, a district court cannot enjoin actions that are the natural outcome of the agency's decision"); *Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 422, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965); *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 69, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970); *Pacific Power & Light Co. v. Bonneville Power Admin.*, 795 F.2d 810, 816 (9th Cir.1986) (barring district court contract action as challenge to administrative rate determination solely reviewable by court of appeals); *Ordower v. Office of Thrift Supervision*, 999 F.2d 1183, 1188 (7th Cir.1993) (district court did not have jurisdiction over action for breach of fiduciary duty which was, in substance, a challenge to an administrative ruling because the relief sought would "penalize action that the agency has approved or that is the natural outcome of the agency's decision"); *In re Olympia Holding Corp.*, 160 B.R. 185, 190–91 (N.D.Fla.1993) (bankruptcy court had no jurisdiction over adversary proceeding that challenged Interstate Commerce Commission rule), *aff'd on other grounds*, 88 F.3d 952 (11th Cir.1996).

Jurisdiction with respect to bankruptcy cases and proceedings is conferred by Congress on the district courts under 28 U.S.C. § 1334, which provides in subsections (a) and (b) as follows:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

Congress has authorized the district courts to refer jurisdiction over bankruptcy cases to the bankruptcy judges for the district, and bankruptcy judges may hear and determine all "core proceedings" arising under Title 11, including proceedings relating to fraudulent conveyances. Section 157 provides in pertinent part as follows in subsections (a) and (b):

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate;

\*   \*   \*   \*   \*   \*

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

■ These statutory provisions confer upon the district and bankruptcy courts exclusive jurisdiction to administer the Bankruptcy Code and Rules and to resolve claims, adversary proceedings and contested matters arising under the Code. The role of the bankruptcy court is to adjudicate and adjust the rights of creditors and debtors in accordance with the Code. Nothing in section 309(j) of the FCA or any other statute confers any regulatory or other jurisdiction upon the FCC to make rules or other determinations with respect to its own status *as a creditor* vis-a-vis its debtors or other creditors of its debtors. No such jurisdiction is claimed by the FCC. By the same token, the Bankruptcy Code expressly recognizes the exclusive jurisdiction of regulatory agencies to perform the regulatory functions conferred upon them by statute. Thus, section 362 of the Bankruptcy Code governing the automatic stay, one of the centerpieces of the Code, provides an exception to the automatic stay in subsection (b)(4) for "an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power." However, as recognized by the FCC (Memorandum at ftn. 5 p. 18), the FCC *in its capacity as a creditor* is subject to the Bankruptcy Code including the automatic stay. *See NLRB v. 15th Avenue Iron Works, Inc.,* 964 F.2d 1336, 1337 (2d Cir.1992); *Matter of Fugazy Exp., Inc.,* 114 B.R. 865 (Bankr. S.D.N.Y.1990), *aff'd,* 124 B.R. 426 (S.D.N.Y.1991), *appeal dismissed,* 982 F.2d 769 (2nd Cir.1992), *motion to vacate denied,* 159 B.R. 432 (Bankr.S.D.N.Y. 1993), *leave to appeal denied,* 163 B.R. 434 (S.D.N.Y.1994).

The task on this motion is to determine whether the claims asserted against the FCC by NextWave affect NextWave in its capacity as a creditor, or require this Court to examine, pass judgment upon and attach legal consequences to the conduct of the FCC acting within the regulatory jurisdiction conferred upon it by Congress.

### The first cause of action

■ The first cause of action entitled "Fraudulent Conveyance of C Block Licenses to NPCI," paragraphs 63–70 of the First Amended Complaint, does not allege any regulatory conduct on the part of the FCC. It simply asserts that the "transfers" alleged in paragraphs 63–70, comprising the $475 million of deposits and the $4.26 billion of Notes executed by NextWave and transferred to the FCC, exceeded the value of the property received by NextWave from the FCC in exchange, namely, the 63 C block licenses, which are alleged to have had a value of less than $1 billion on February 19, 1997 when the Notes were executed by NextWave. The first cause of action seeks the equitable remedies of avoidance for the benefit of other creditors and the debtor available under 11 U.S.C. § 544. The claim asserted in the first cause of action is constructive fraudulent conveyance and implicates no conduct of the FCC. Whatever may be the merits of the first cause of action as a matter of bankruptcy law, this Court will not be called upon to adjudicate or attach any consequence to any act or omission of the FCC in its regulatory capacity. Congress has not vested in the FCC any regulatory power with respect to its status as a creditor or its rights to share with other creditors in the limited assets of its debtors. Nor has Congress deprived the district court or the bankruptcy court of jurisdiction under 28 U.S.C. §§ 1334(a) and 157(a) and (b) to hear and determine matters arising under Title 11, including 11 U.S.C. § 544.

The FCC argues that when Congress authorized it to allocate blocks of radio spectrum by competitive bidding "it was

emphatic that the organization, execution and implementation of such auctions fell squarely within the agency's regulatory power" (FCC Memo p. 11). That is unquestionably so, but the first cause of action does not seek to litigate any issue with respect to the organization, execution or implementation of the radio spectrum auctions.

Quoting from Commission Susan Ness, the FCC argues that "the Commission's fundamental role is that of a licensing agency, not that of a lender ... Those who say the [FCC] functioned as a banker are mistaken.... We never assumed the responsibility of creating 'commercially reasonable alternatives' for whatever difficulties the C block licenses [sic] encountered" (FCC Memo pp. 14–15). Commissioner Ness is, of course, correct in acknowledging that Congress never conferred upon the FCC "the responsibility of creating 'commercially reasonable alternatives' for whatever difficulties the C block licenses [sic] encountered"—indeed, Congress has provided in the Bankruptcy Code for the adjustment of creditors' rights and the fair allocation among creditors of the limited assets of a debtor. But Commissioner Ness is obviously incorrect in asserting, if that was her intent, that the FCC is not a creditor. There can be no dispute that the FCC is a creditor, and nothing in section 309(j) or elsewhere in the FCA or in the Bankruptcy Code states that the FCC is exempt from any of the provisions of the Code which affect it *as a creditor.*

At oral argument counsel for the FCC stated that the FCC's motion with respect to the first cause of action is dependent on the Restructuring Orders. In essence, the position is that the Restructuring Orders constituted final administrative determinations establishing the four mutually-exclusive alternatives for NextWave to readjust its $4.26 billion indebtedness to the FCC and, as final Orders, they may be reviewed only by the Circuit Court; any relief granted by the Bankruptcy Court under 11 U.S.C. § 544 would necessarily conflict with the Restructuring Orders and thereby invade the purported jurisdiction of the FCC and the Circuit Court. It is argued that the adoption of the Restructuring Orders constituted an "intervening action" of the FCC which divested the Bankruptcy Court of jurisdiction which it might have had to administer those provisions of the Bankruptcy Code which would otherwise have applied to the FCC as a creditor.

The basic defect in the FCC's argument is that Congress did not confer upon the FCC the power to determine unilaterally its own rights as a creditor in competition with and to the detriment of other creditors. A fundamental objective of the Bankruptcy Code is to insure fairness and equality of treatment among creditors whose claims may vastly exceed the assets of the debtor, as in this case. Thus, the objective of fraudulent conveyance provisions is to insure that other creditors are not unfairly disadvantaged by the claim of a single creditor who, in a fraudulent or constructively fraudulent transaction, conveyed property to a debtor worth substantially less in value than the amount of its claim. Aside from fairness to other creditors, fraudulent conveyance and other provisions of the Bankruptcy Code are designed in part to facilitate the capacity of a debtor to reorganize and thereby repay its debts as they may be restructured in a confirmable plan. Nothing in Section 309(j) or elsewhere in the FCA even suggests that Congress intended to empower the FCC to promulgate orders which have nothing to do with its regulatory functions and which are designed solely to enhance the FCC's position as a creditor to the detriment of rights provided under the Bankruptcy Code for the benefit of other creditors and the debtor.

■ That is not to say that the FCC did not have the right to promulgate the Restructuring Orders, as expressing the alternatives to which the FCC would voluntarily agree for the relief of C block licensees. Any party, whether government agency or private person, may formulate

alternatives which it, as a creditor, would be willing to accept for the relief of its debtors. But in the absence of a clear expression by Congress, neither a Federal agency nor a private person has the power to dictate its own rights as a creditor and thereby confound the rights of other creditors and the debtor established by Congress under the bankruptcy laws. The FCA does not grant the FCC any such power and, as shown in NextWave's submissions, Congress declined to pass a bill propounded by the FCC which would have expressly voided the Bankruptcy Court's jurisdiction in cases such as this.

Little need be said of the FCC's argument that the FCA preempts a state fraudulent conveyance claim. First, the FCC does not and cannot take the position that the FCA preempts Section 544 of the Bankruptcy Code. Second, a state law claim may only be preempted by federal law under three circumstances: (i) where Congress defines explicitly the extent to which its enactments preempt state law or, in the absence of such explicit statutory language, (ii) where state law "regulate[s] conduct in a field that Congress intended the Federal Government to occupy exclusively" or (iii) where state law "actually conflicts with federal law." *English v. General Electric Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). None of these circumstances exist in this case. Nothing in the FCA conflicts with a fraudulent conveyance claim or manifests an intent to legislate with respect to debtor-creditor relations or to authorize the FCC to dictate for itself a preferred creditor status at variance with state or Federal debtor-creditor laws or the Bankruptcy Code.

### The second cause of action

■ The second cause of action of the First Amended Complaint is based exclusively on alleged misconduct of the FCC acting in its regulatory capacity. Thus, paragraph 92 alleges:

92. The FCC completely controlled all aspects of the C block auction process, including the rules, timing and manner in which the C block licenses were issued to NPCI. The C block licenses constitute all or substantially all of NPCI's assets. The FCC thus controlled NPCI's business and all of its assets.

Virtually every one of paragraphs 92 through 115, comprising the operative allegations of the second cause of action, allege conduct of the FCC in its regulatory capacity conferred under section 309(j), including such matters as the failure to inform NextWave that the FCC would commence and conclude bidding on the D, E and F blocks before NextWave received its license approvals (¶ 97), the destruction of the value of C block licenses by conducting the D, E and F block auctions (¶ 104), the FCC's unreasonable delay in granting NextWave's licenses (¶ 107) and the like, concluding with the general allegations in paragraphs 114 and 115 that the FCC was guilty of inequitable, unconscionable and unfair conduct resulting in injury to NextWave and its creditors and conferring an unfair advantage on the FCC.

■ The case law discussed above makes clear that district courts and by reference bankruptcy courts do not have jurisdiction to adjudicate the propriety of and attach legal consequences to the conduct of the FCC or other regulatory agencies acting within the scope of the powers conferred on them by Congress. That is precisely what the second cause of action would require this Court to do.

■ The fact that the remedy sought in the second cause of action, subordination, is one prescribed under the Bankruptcy Code, 11 U.S.C. § 510, is not relevant. As the cases make clear, neither the nature of the cause of action alleged nor the form or legal source of the relief sought is determinative of the jurisdictional question. *See Sutton v. U.S. Department of Transportation*, 38 F.3d 621, 625, 626 (2d Cir.1994) ("[t]he exclusive jurisdiction of courts of appeals to review FAA determinations based in substantial part on ... [t]he [FAA] Act applies without regard to other substantive claims asserted in the com-

plaint;" the fact that the plaintiffs "characterized their challenge as a claim for violation of [non-FAA Act statutory provisions] does not change the fact that the substantive claims alleged in their complaint are based in substantial part on the FAA's determination made pursuant to ... the [FAA] Act"); *City of Rochester v. Bond,* 603 F.2d 927, 936 (D.C.Cir.1979) ("Congress [did not intend] the exclusivity vel non of statutory review to depend on the substantive infirmity alleged"). Subject matter jurisdiction depends on whether the claim asserted arises from conduct of the agency which relates to "the substantive core of an agency's mandate." *City of Rochester,* 603 F.2d at 937.

It follows from the foregoing that this Court does not have subject matter jurisdiction to adjudicate the propriety of the FCC's regulatory conduct complained of in the second cause of action.

  *   *   *   *   *   *

Counsel for NextWave and the FCC are directed to confer together and jointly prepare an order, agreed as to form, consistent with this decision, without prejudice to the right of either party to appeal.