### In re NextWAVE PERSONAL COMMUNICATIONS INC., et al., Debtors.

### Bankruptcy No. 98 B 21529 (ASH).

United States Bankruptcy Court, S.D. New York.

Jan. 31, 2000.

Andrews & Kurth, L.L.P., By Deborah L. Schrier–Rape, Gregory H. Bevel, Dallas, TX, for Debtors.

Mary Jo White, United States Attorney for the Southern District of New York, By Daniel S. Alter, Neil M. Corwin, New York, for Creditor Federal Communications Commission.

Kasowitz, Benson, Torres & Friedman, LLP, By David S. Rosner, New York, for Unsecured Creditors Committee.

Salans, Hertzfeld, Heilbronn, Christy & Viener, By William F. Gray, Emanuel C. Grillo, New York, for DIP Lender D & P NextWave Partners, L.P.

### DECISION ON MOTION TO ENFORCE THE AUTOMATIC STAY

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

On January 12, 2000 the Federal Communications Commission ("FCC") gave public notice (the "January 12 Declaration") to the debtors (collectively, the "debtors" or "NextWave") in these jointly administered Chapter 11 cases that all of NextWave's C block and F block licenses (the "Licenses") for broadband personal communications service ("PCS") had been automatically cancelled under FCC regulations as of late 1998 or January 1999. The January 12 Declaration was issued a scant nine days before the scheduled January 21, 2000 hearing on NextWave's Modified First Amended Joint Plan of Reorganization (the "Plan"), under which NextWave proposed to pay *in full* the balance of its outstanding installment obligations to the FCC and all amounts owing to unsecured creditors.

Aside from the Draconian economic consequences of cancellation to other creditors and equity, the January 12 Declaration was shocking because it followed over one year of intense litigation costing the debtors' estates upwards of $10 million in professional fees and other expenses in three Federal courts entailing expenditure of untold hours of judicial resources by one Bankruptcy Judge (Hardin), at least four District Judges (Brieant, Parker, Pollack, Chin) and at least three Circuit Judges (McLaughlin, Jacobs, Sack), all of which was premised on the assumption that the Licenses were vested in NextWave, and all of which was utterly unnecessary and incomprehensible if the Licenses had in fact and law been automatically cancelled over a year ago. The January 12 Declaration conflicted with countless written and oral utterances and acts of the FCC throughout the past year. And, astonishingly, the January 12 Declaration followed by one day a letter from the President of NextWave to the Chairman of the FCC offering to satisfy NextWave's entire ten-year installment obligation to the FCC by making a single lump sum payment upon confirmation in excess of $4.3 billion.

Faced with catastrophic consequences to all parties in interest in these debtors' estates, NextWave moved by order to show cause returnable January 21, 2000 for an order holding the FCC's January 12 Declaration null and void on the grounds, *inter alia*, that it violated the automatic stay, 11 U.S.C. § 362(a). As amplified below, the motion is granted for three quite separate reasons: (I) the January 12 Declaration violated the Bankruptcy Code; (II) the debtors cannot be held to have defaulted for failure to make payments on a pre-petition claim which they could not make under the Code without a court order; and (III) the FCC is barred by its

own conduct from asserting a retroactive forfeiture under the doctrines of equitable estoppel and waiver.

### Jurisdiction

This Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding under 28 U.S.C. § 157(b).

### Background

The material facts in these Chapter 11 proceedings have been set forth in varying detail in five published decisions of this Court, one decision of the District Court and one published decision of the Court of Appeals, all briefly described below. This decision will set forth the factual and decisional background only to the extent necessary to give context to the issues presented and decided on this motion. For a more comprehensive statement of facts, *see NextWave IV.A*, 235 B.R. 277 (Bkrtcy. S.D.N.Y.1999)

On May 6 and July 16, 1996, NextWave was declared the high bidder for 63 licenses in the FCC's auction and reauction, respectively, of C block licenses (the "C Licenses"). NextWave filed the required long form applications seeking FCC approval, to which objections were filed. On January 3, 1997 the FCC announced that NextWave would receive its C Licenses, conditioned on compliance with its financial obligations to the FCC.

On January 9, 1997 NextWave made an additional deposit with the FCC bringing its total cash deposits to $474,364,806, or 10% of its total bid price. On February 19, 1997 NextWave executed notes (the "Notes") and accompanying security agreements in the aggregate face amount of $4,269,283,223 (rounded, $4.3 billion), dated as of January 3, 1997. The FCC awarded the C Licenses to NextWave affiliate NPCI.

Another NextWave affiliate was high bidder for certain F block licenses (the "F Licenses") which were issued to NextWave in the spring of 1997. The litigation with the FCC concerned only the C Licenses, until the January 12 Declaration.

Between the conclusion of the C block auction and reauction on May 6 and July 16, 1996 and the actual issuance of the C Licenses in January/February 1997 in exchange for $4.7 billion of cash and Notes, the value of PCS spectrum as perceived in the marketplace plummeted. As a consequence, NextWave and the other C block license winners were unable to raise a single dollar of the estimated $1.6 billion of public financing which the C block licensees needed to build out their PCS systems. Recognizing this fact, the FCC issued orders suspending all payments on both C block and F block licenses in the spring of 1997, conducted public hearings and issued certain restructuring orders.

The NextWave entities filed voluntary petitions under Chapter 11 on June 8, 1998. On the same date NextWave filed the complaint in an adversary proceeding against the FCC alleging two separate causes of action. Count I alleged a claim under Section 544 of the Bankruptcy Code for constructive fraudulent conveyance; Count II sought equitable subordination of the indebtedness to the FCC under Section 510 of the Bankruptcy Code by reason of the FCC's *de facto* control" over NextWave and its alleged "inequitable, unconscionable and unfair conduct" between July 1996 and January 1997 (in essence, flooding the market with spectrum in order to drive the "scarcity value" out of spectrum). This Court made six substantive rulings in the adversary proceeding, five memorialized in written decisions. The District Court affirmed all six rulings, and the Court of Appeals reversed the District Court and this Court in a published decision. Each of these rulings will be

discussed to the extent appropriate in the context of this motion.

### Prior Court Decisions

#### Nextwave I (235 B.R. 263)

In response to the complaint, the FCC simultaneously filed a motion in the District Court to withdraw the reference and a motion to dismiss the adversary proceeding for lack of subject matter jurisdiction. The District Court denied the motion to withdraw the reference in October 1998 and remanded to this Court to decide the motion to dismiss. After a hearing in November, this Court issued its decision denying the motion to dismiss as to Count I (fraudulent conveyance) and granting the motion to the extent of dismissing Count II (equitable subordination). *NextWave I*, 235 B.R. 263 (Bankr.S.D.N.Y. Dec.7, 1998). Count II was dismissed because "the second cause of action is based upon conduct of the FCC acting in its regulatory capacity [and][t]his Court will decline to review or adjudicate the consequences of the FCC's acts and omissions in matters over which Congress has granted the FCC primary jurisdiction." 235 B.R. at 265. The motion to dismiss Count I was denied because "the first cause of action arises solely out of the FCC's status as a creditor of NextWave and does not seek to challenge any act or omission of the FCC or to affect the FCC in any manner except in its capacity as a creditor." *Id.* This Court concluded that nothing in the enabling statute, Federal Communications Act ("FCA") § 309(j), or elsewhere in the FCA manifested an intention of Congress to preempt the operation of the Bankruptcy Code in cases where the FCC was acting in the capacity of a creditor, whose actions, rights and obligations as a creditor would affect the rights and obligations of other creditors and parties in interest in a debtor's estate.

#### NextWave II (235 B.R. 272)

The FCC next made a motion for partial summary judgment fixing the date on which NextWave became obligated to pay the $4.7 billion of its winning bids, a crucial determination in a constructive fraudulent conveyance proceeding where the central issue is whether the consideration given by the debtor (cash plus debt) exceeded the value of the property transferred to the debtor in exchange therefor (the C Licenses). Since NextWave's financial obligation to the FCC under the FCC's auction regulations would not have been $4.7 billion but some indeterminable lower figure if for any reason the FCC did not grant NextWave the C Licenses (less than 5% of the $4.7 billion if, for example, the C Licenses were reauctioned for amounts exceeding NextWave's bids), and since the actual transfer of the C Licenses in exchange for $473 million cash and $4.3 billion of Notes did not take place until January/February 1997, this Court fixed January 3, 1997 as the critical date for constructive fraudulent conveyance purposes.

#### NextWave III

On April 2, 1999 this Court denied the FCC's second motion to dismiss in an unpublished decision from the bench.

#### NextWave IV.A (235 B.R. 277)

On May 12, 1999, after a trial on the issue of valuation of the Licenses, this Court issued its Decision on Constructive Fraudulent Conveyance Claim concluding that "$1,023,211,000 may be said to constitute the fair market value of the entire consideration received by NPCI in exchange for the entire $4.7 billion of Transfers, for purposes of fraudulent conveyance analysis." 235 B.R. at 304.

#### NextWave IV.B (235 B.R. 305)

After a further hearing, on June 22, 1999 this Court issued its Decision on Remedy. Noting the "utter irrationality of the FCC's proposed remedy," 235 B.R. at 311, and rejecting the remedy of rescission which the FCC expressly stated was "not what we seek," 235 B.R. at 308, this Court adopted the traditional constructive fraudulent conveyance remedy of avoidance, the effect of which was to reduce the NextWave obligation from $4.7 billion

(10% of which has been paid) to $1,023,-000,000, being the actual fair market value of the C Licenses in January/February 1997.

### NextWave V (235 B.R. 314)

Following the Decision on Remedy, *NextWave IV.B*, the FCC moved to lift the automatic stay under 11 U.S.C. § 362(d)(1) for "cause." The "cause" relied upon was the failure, or rather the prospective failure, of NextWave to pay the full amount ($4.7 billion) of its winning auction bids by reason of this Court's Decision on Remedy in *NextWave IV.B*. As a consequence of the prospective default, the FCC sought an order for relief from stay from this Court so that the Licenses could be automatically cancelled under the terms of the FCC regulations. Considering the issue thus raised to be governed by the initial decision on subject matter jurisdiction in *NextWave I*, this Court ruled that, since the FCC is subject to the Bankruptcy Code in its capacity as a creditor, the reduction in NextWave's obligation to the FCC in the Decision on Remedy did not result in a present or prospective default and, lacking any default, there was no "cause" to lift the stay. Accordingly, the motion was denied.

### The District Court Decision

On July 27, 1999 the District Court (Hon. Charles L. Brieant) issued a decision and order affirming all six aforementioned rulings of the Bankruptcy Court. *NextWave Personal Communications, Inc. v. FCC (In re NextWave Personal Communications, Inc.)*, 241 B.R. 311 (S.D.N.Y. 1999).

### The Court of Appeals Decision

On November 24, 1999 the Court of Appeals for the Second Circuit issued an order reversing the judgment of the District Court and remanding the case for further proceedings, with an opinion to follow. The opinion (the "Circuit Court Decision") was issued on December 22, 1999. *Federal Communications Commission v. Nextwave Personal Communications, Inc. (In re Nextwave Personal Communications, Inc.)*, 200 F.3d 43 (2d Cir. 1999). It is not clear whether the FCC appealed *NextWave III, NextWave IV.A, NextWave IV.B* or *NextWave V*. But it is clear that none of those decisions was addressed in the Circuit Court Decision. The Circuit Court Decision reversed the Bankruptcy Court and the District Court in respect of *NextWave I* and *II*.

With respect to the former, the Circuit Court Decision disagreed with the basic premise of *NextWave I* which distinguished between the FCC acting in its capacity as a regulatory agency, as to which the District Court/Bankruptcy Court would have no subject matter jurisdiction, and the FCC as a creditor, as to which the District Court/Bankruptcy Court would have jurisdiction to adjudicate debtor-creditor issues arising under the Bankruptcy Code. While recognizing the FCC's dual role as creditor and regulator under FCA § 309(j), the Court of Appeals concluded that the "payment in full" requirement of the FCC regulations, while a credit provision in the context of a C block licensee paying in installments, was also related to a regulatory function as to which the FCC had primary jurisdiction. Starting with the Congressional premise, articulated in the legislative history, that "[b]ecause new licenses would be paid for, a competitive bidding system [would] ensure that spectrum is used more productively and efficiently than if handed out for free," the Circuit Court Decision concluded:

> . . . the FCC made "full and timely payment of the winning bid" a regulatory condition for obtaining and retaining a spectrum license required through a § 309(j) auction. *See* 47 C.F.R. § 24.708.[1]

1. 47 C.F.R. § 24.708 states, in relevant part:
 (a) **Except with respect to entities eligible for installment payments** (*see* § 24.711),

each winning bidder will be required to pay the balance of its winning bid in a lump sum payment within five (5) business days

This "payment in full" requirement has a regulatory purpose related directly to the FCC's implementation of the spectrum auctions.

200 F.3d at 52. Rejecting the Bankruptcy Court's premise that the fraudulent conveyance claim "concern[ed] solely the debtor-creditor relationship between the FCC and [NextWave]" and the District Court's premise that the fraudulent conveyance claims did not "implicate the FCC's power to regulate the issuance or use of spectrum licenses," the Circuit Court Decision said:

> This approach was fundamentally mistaken. The FCC's auction rules promulgated under § 309(j) have primarily a regulatory purpose: to insure that spectrum licenses end up in the hands of those most likely to further Congressionally defined objectives. The fact that market forces are the technique used to achieve that regulatory purpose does not turn the FCC into a mere creditor. . . .

*Id.* at 54. Having so ruled, the Circuit Court Decision went on to say the following:

> This is not to say that [the District Court and Bankruptcy Court] lacked jurisdiction over every aspect of the relationship between the FCC and NextWave. To the extent that the financial transactions between the two do not touch upon the FCC's regulatory authority, they are indeed like the obligations between ordinary debtors and creditors.

*Id.* at 55. And in footnote 11 on the same page, the Circuit Court Decision said:

> 11. The bankruptcy court held: "The basic defect in the FCC's argument is that Congress did not confer upon the FCC the power to determine unilaterally its own rights *as a creditor in competition with and to the detriment of other creditors.*" *NextWave I,* 235 B.R. at

following the award of the license. Grant of the license will be conditioned upon **full and timely payment** of the winning bid amount. (Emphasis supplied)

270. That is surely true. But as we have repeatedly stated, that analysis is misplaced if it allows the bankruptcy court to adjudicate claims against the FCC not as a creditor, but as an allocator of licenses. Such was the case here. . . .

Thus, the Circuit Court Decision "remand[ed] the case to the bankruptcy court for further proceedings consistent with this opinion, if any are necessary." *Id.* at 62.

Turning to *Nextwave II,* the Circuit Court Decision concluded that "NextWave became obligated to the FCC for the full amount of its winning bids at the close of the C-block auction, and that the transaction in which the Licenses were issued was therefore not constructively fraudulent." *Id.* at 56.

The Circuit Court Decision agreed with the proposition (quoting from *NextWave IV.A,* 235 B.R. at 290) "that the question of reasonably equivalent value is determined by the 'value of the consideration exchanged between the parties *at the time of the conveyance or incurrence of the debt* which is challenged.'" *Id.;* emphasis in Circuit Court Decision. Accordingly, "[t]he date on which the payment obligation arose is therefore crucial to whether this obligation is avoidable." *Id.* at 56. The Circuit Court Decision framed the issues as follows:

> When did NextWave take on the obligation to pay $4.74 billion for what it bid at auction? And that question suggests another: What did NextWave bid $4.74 billion to get?

*Id.* at 57. The Circuit Court Decision answered the latter question: "We conclude that NextWave bid $4.74 billion for the right——excluding other bidders—— to be the qualified licensee of the licenses." *Id.* at 57.[2] On this premise, the Circuit

2. This Court ruled in *Nextwave II* that NextWave's cash payments and Notes aggregating $4.74 billion were consideration not for the

Court Decision held that "NextWave became obligated to the FCC for the full amount of its winning bids at the close of the C-block auction." *Id.* at 56.[3]

### Confirmation Proceedings

NextWave's First Amended Disclosure Statement was approved by order dated July 27, 1999. Over 99% of all creditors and equity interest holders who submitted ballots voted in support of the debtors' Plan, and a hearing on confirmation of the Plan was scheduled for September 8, 1999. On August 31, 1999 the Court of Appeals granted the FCC's motion for a stay of the confirmation hearing pending appeal.

On December 16, 1999, NextWave filed modifications to the Plan, providing, *inter alia,* that the debtors would pay all unsecured creditors and the FCC *in full,* regardless of the outcome of the appeal pending in the Circuit Court. The confirmation hearing on NextWave's modified Plan was further adjourned, ultimately to January 21, 2000.

Seeking to persuade the FCC to reach an agreement, NextWave's President wrote to the FCC Chairman on December 29 explaining that under its modified Plan NextWave would pay the FCC, at confirmation, "an amount equal to all principal and interest accrued to date, plus any applicable late payment fees," and thereafter NextWave "would resume quarterly payments of its $4.3 billion principal and over $1.5 billion interest obligation in accordance with the Commission's schedules,

lasting through the Company's PCS license term" (NextWave letter dated December 29, 1999 to the FCC Chairman, Exhibit A annexed to Bevel Declaration).

Continuing its negotiations with the FCC, by letter to the FCC Chairman dated January 11, 2000 and delivered on that date, NextWave proposed

> an arrangement under which NextWave would make a single lump sum payment at confirmation to satisfy its entire obligation [in excess of $4.3 billion] to the FCC. Accelerating all our payments in this manner would eliminate any future installment payments, and would provide the Commission with absolute assurance that it will never have to deal with the issue of collecting any additional license payments from NextWave.

Exhibit B to Bevel Declaration.

### The January 12 Declaration

The FCC responded to NextWave's January 11 letter by issuing the January 12 Declaration. This consisted of three documents, all dated and issued January 12: the FCC's formal objection to NextWave's Modified Plan; a news release bearing the headline "FCC Informs Court That NextWave Licenses Have Cancelled and Sets Date for Auction;" and a Public Notice of "Auction of C and F Block Broad Band PCS Licenses" scheduled for July 26, 2000.

It is important to note that *at no time* prior to the January 12 Declaration did the FCC ever assert the position, or even inti-

---

mere *right* to be the qualified licensee, but for the actual C Licenses themselves. In fact, as shown in *NextWave IV.A,* 235 B.R. at 291–93, NextWave's only *irrevocable* financial commitment (its "ticket of admission" to the approval process) at the close of the auctions was the 3% penalty (equating to $142,309,000) under the FCC regulations, 47 C.F.R. § 1.204(g)(2), although its contingent liability was much greater. *See* footnote 3.

**3.** In *Nextwave II* this Court concluded that, at the close of the C block auctions, NextWave did not incur a *liability* for its $4.74 billion aggregate winning bids——it incurred a *contingent liability,* necessarily less than

$4.7 billion, for penalties including the difference between NextWave's winning bids and the winning bids in a subsequent reauction of the C Licenses. Thus, if the C Licenses had been reauctioned for $4.74 billion or more, the contingent liability could have been reduced to less than 5% of $4.74 billion. Moreover, the issue in the fraudulent conveyance proceeding did not concern a hypothetical, unquantifiable and non-existent contingent liability for penalties; it concerned the value of the consideration actually received by NextWave (the C Licenses) in exchange for its actual cash payments and Notes issued in February 1997 aggregating $4.74 billion.

mate, that NextWave's C and F Licenses had automatically cancelled in late 1998 or early 1999 or at any other time on account of a default resulting from the passage of some ambiguous deadline for the payment of some unquantified amount in respect of the FCC's pre-petition claims against NextWave. To the contrary, the FCC made repeated declarations in judicial proceedings utterly inconsistent with the notion that NextWave's Licenses automatically cancelled in January 1999, and all three Federal courts which have issued rulings in these proceedings have done so upon the assumption that the licenses were not cancelled.[4]

### The Alleged "Default"

The foundation of the January 12 Declaration of cancellation of the Licenses is a "default" by NextWave in its installment obligations under the Notes. The threshold question is whether there was a "default," in the sense of a legal breach of duty having enforceable legal consequences, as distinguished from a "default" in the colloquial sense of failure to pay timely under some legally suspended, superceded or otherwise unenforceable obligation.

It is, of course, true that there has been a delay in payment of principal and interest under the Notes, and that delay will persist until the debtors' Plan becomes effective, if it ever does. It is also true that past due installments, interest and penalties have not been waived or forgiven and will have to be paid, or the Licenses ultimately will be cancelled. But it does not follow that NextWave's failure to pay timely under the terms of the Notes or the FCC regulations constituted a legal "default" triggering forfeiture of the Licenses.

The alleged "default" is phantom for two quite different reasons.

■ First, the retroactive declaration of forfeiture for failure to pay an unquantified and possibly unquantifiable amount, within an unspecified and possibly undeterminable deadline, with no prior notice and therefore no opportunity to comply with the obligation (whatever the obligation was) raises serious questions of Constitutional deprivation of property without due process of law. The existence of a default here depends upon an interpretation of the FCC's regulations, because all payments by C and F block licensees were suspended by FCC orders in March and April 1997. As shown in Appendix A to this decision, the FCC regulations concerning resumption of payment obligations are numerous, complex and confusing both as to payment deadlines and amounts due. It appears that the FCC itself is incapable of determining even now, long after the fact, either the date(s) of NextWave's default(s) or the amount(s) then due. It is offensive to due process to make a retroactive declaration of cancellation of property rights based upon a "default" more than a year ago which cannot be identified either as to date or amount due, of which the debtors had no fair notice and no opportunity to cure.

Transcendent considerations of fairness and due process, as expressed in the very statute that governs the FCC, compel the conclusion that the FCC cannot summarily eviscerate the debtors' estate on the basis of a purported "regulatory default." The FCA requires notice and an opportunity to be heard where violations touching its regulatory purview warrant the revocation or suspension of a license. *See* 47 U.S.C. § 312 ("Administrative Sanctions"—requiring the FCC to serve an order to show

---

4. For example, the Court of Appeals said:
 ... [T]he FCC has not yet sought to take any action vis-a-vis the Licenses. While it would probably be fair to assume that the FCC will seek to revoke the Licenses and collect on its debts, we cannot presume to

know in advance the course that the agency will ultimately follow....It is possible that if the FCC chooses to pursue some of these options——say, collection on the notes—— it may find itself acting as a creditor. (200 F.3d at 59 n. 15)

cause on thirty days' notice for station license revocation procedures or cease and desist orders) and 47 U.S.C. § 303 ("Powers of the Commission"—requiring fifteen days' notice and opportunity to request a hearing for actions taken to suspend an operator's license). The Bankruptcy Code also requires, as an element of basic fairness and due process, notice, a hearing and court approval before actions impacting vital interests may be taken. The FCC's reliance upon a purported "regulatory" default, itself premised upon constantly shifting and sometimes inconsistent agency interpretations, only exacerbates the fundamental unfairness of its action. Deprivation of property by agency fiat, without any procedural or due process safeguards, cannot be countenanced.

■ Second, the debtors' failure to make post-petition payments on the Notes cannot be deemed a legal "default" triggering a forfeiture of the Licenses because such payments were prohibited under the Bankruptcy Code. Even if the FCC regulations suspending the 1997 suspension orders clearly and unambiguously specified payment deadlines and amounts due for C and F block licensees, the payment obligations thus identified were necessarily suspended for the NextWave debtors upon their filing petitions under Chapter 11 on June 8, 1998. As shown in point II, below, the Bankruptcy Code prohibits a debtor from making payments on pre-petition claims to a select creditor or creditors. With exceptions not here applicable, under Section 363 and other provisions of the Code the debtors' property can be used to pay pre-petition claims only pursuant to court order or in the context of a confirmed plan of reorganization. Since a Chapter 11 debtor is precluded from making post-petition payments on a pre-petition claim, NextWave's failure to make payments on the Notes in accordance with a time schedule set by the Notes or by the FCC regulations cannot be deemed a legal "default" triggering automatic cancellation of the Licenses.

### The Alleged "Automatic" Cancellation

■ The FCC's authority for automatic cancellation is 47 C.F.R. § 1.2110(f)(4)(iv), which provides:

(iv) Any eligible entity that submits an installment payment after the due date but fails to pay any late fee, interest or principal at the close of the 90–day non-delinquency period and subsequent automatic grace period, if such a grace period is available, *will be declared in default*, its license will automatically cancel, and will be subject to debt collection procedures. (emphasis supplied)

Under the regulation, a "default" must "be declared" before "automatic" cancellation can occur.

The FCC argued that, despite the language "will be declared in default," it was incumbent on the debtors, before a "default" occurred, to seek an extension or waiver before any discretion of the FCC could be invoked. The history of this regulation indicates otherwise. As originally promulgated in 1994, the default and cancellation provision read as follows:

(4) A license granted to an eligible entity that elects installment payments shall be conditioned upon the full and timely performance of the licensee's payment obligations under the installment plan.

(i) If an eligible entity making installment payments is more than ninety (90) days delinquent in any payment, it shall be in default.

(ii) Upon default or in anticipation of default of one or more installment payments, a licensee may request that the Commission permit a three to six month grace period, during which no installment payments need be made. In considering whether to grant a request for a grace period, the Commission may consider, among other things, the licensee's payment history, including whether the licensee has defaulted before, how far into the license term the default occurs, the reasons for default, whether

the licensee has met construction build-out requirements, the licensee's financial condition, and whether the licensee is seeking a buyer under an authorized distress sale policy. If the Commission grants a request for a grace period, or otherwise approves a restructured payment schedule, interest will continue to accrue and will be amortized over the remaining term of the license.

(iii) Following expiration of any grace period without successful resumption of payment or upon denial of a grace period request, or upon default with no such request submitted, the license will automatically cancel and the Commission will initiate debt collection procedures pursuant to Part 1, Subpart O.

59 FR 44272–01 at 44298 (Implementation of Section 309(j) of the Communications Act—Competitive Bidding, August 26, 1994) (emphasis supplied). As originally promulgated, it was indeed up to the licensee to actively request a grace period, and there was no requirement that a default be "declared." But this language was changed to the now applicable "will be declared in default." The FCC never declared a default.

The FCC has argued that the "automatic" cancellation provision is analogous to the regulations in *In re Gull Air, Inc.*, 890 F.2d 1255 (1st Cir.1989) and *In re Yellow Cab Co-op. Ass'n*, 132 F.3d 591 (10th Cir. 1997), where cancellation involved no action and no exercise of judgment or discretion on the part of the administrative agency. The licenses for airport landing slots in *Gull Air* and taxicab medallions in *Yellow Cab*, by their terms, depended for their continued existence on actual utilization of the landing slots and taxicab medallions and lapsed when no longer used. Thus, termination of the licenses took place with no act, declaration, judgment or discretion exercised or exercisable by the regulatory agency.

The facts are quite different here. Cancellation in this case is not predicated on a "use it or lose it" requirement, but upon delay in payment. The regulation involved requires the FCC to do something (declare a default), and the FCC has the power, in its sole judgment and discretion, to suspend, reinstate and repeatedly change deadlines for payment of C and F block spectrum licenses, both generally and for specific licensees, and to waive payment defaults, and it has repeatedly exercised that power, all as documented in Appendix A.

Moreover, even if the regulation did not require a declaration of default and the FCC did not have discretion to suspend, reinstate, extend and waive payment deadlines, it is still not accurate to say that cancellation is truly "automatic." This is so because, in the real world, unless and until the FCC takes some affirmative action to assert dominion over the licenses of a defaulting licensee, life will go on as before and the parties (including the FCC) will go on spending millions of dollars in litigation costs, DIP lenders will continue lending millions of dollars secured by the licenses, the licensee will continue to expend money in preparation to build out its PCS systems and the courts will continue to expend countless hours of judicial resources, all on the assumption that the licenses have not cancelled. And that is exactly what happened in this case.

Finally, it is not true that no agency discretion is involved in the cancellation. The Restructuring Orders themselves are replete with agency considerations justifying decisions to either extend or refuse to extend the automatic grace periods. If the FCC has sufficient discretion to suspend payments, extend grace periods and grant waivers in the cases of individual licensees, then the contention that the automatic cancellation provision involves no agency discretion is untenable. The very timing of the January 12 Declaration shows a calculated act designed to divest the debtors of the Licenses immediately after the January 11 letter, and before the January 21 confirmation hearing. The cancellation may be "automatic," but it must neverthe-

less be invoked. It is that invocation, on January 12, 2000, which is the subject of the debtors' motion.

## Discussion

### I. The FCC's January 12 Declaration violated the Bankruptcy Code.

■ The FCA does not preempt the Bankruptcy Code.[5] One cannot point to any language in the FCA that expressly or impliedly purports to limit, abridge or affect the Code insofar as it would apply to the FCC as a creditor. Before turning to the FCC's arguments in opposition, we shall examine the Bankruptcy Code implications of the January 12 Declaration.

### A. The automatic stay

■ The automatic stay provided for in Section 362(a) of the Bankruptcy Code is one of the statutory cornerstones of the bankruptcy and reorganization process. It ensures (i) that the assets of a debtor's estate remain intact for adjudication by the Bankruptcy Court and (ii) equality of distribution to creditors in accordance with the priority and distribution scheme of the Code.[6] See e.g., In re Parr Meadows Racing Association, Inc., 880 F.2d 1540, 1545 (2d Cir.1989) (Bankruptcy Code "requires that all creditors, both public and private, be subject to the automatic stay"), cert. denied sub nom., Suffolk County Treasurer v. Barr, 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990). It also ensures that contractual and State or Federal law rights and remedies such as acceleration, forfeiture, imposition of judgment liens and foreclosure will be precluded, held in abeyance or in some cases "cured" and

thereby reversed, in order that the ultimate objective of reorganization in Chapter 11 or Chapter 13 for the benefit of all creditors will not be thwarted by the action of a single creditor. In re Monroe Park, 18 B.R. 790, 791 (Bankr.D.Del.1982) ("It is clear that Congress intended a financially troubled debtor to be able to reorganize after there has been a default and acceleration even in the face of state law which requires the consent of the creditor for cure and reinstatement once the entire amount has become due.") See point I B, below. As noted in Collier on Bankruptcy:

> In reorganization cases, the stay is particularly important in maintaining the status quo and permitting the debtor in possession or trustee to attempt to formulate a plan of reorganization. Without the stay, the debtor's assets might well be dismembered, and its business destroyed, before the debtor has an opportunity to put forward a plan for future operations. Secured creditors and judgment creditors might race to seize and sell the debtor's assets in order to obtain satisfaction of their claims, without regard to the interests of other creditors or the value of keeping assets together in an operating business. The stay prevents this piecemeal liquidation, offering the chance to maximize the value of the business.

3 Collier on Bankruptcy ¶ 362.03[2] at pp. 362–15 (15th Ed. rev.1999).

■ The courts in this Circuit hold that any action taken in violation of the automatic stay is void and without force or effect. 48th Street Steakhouse, Inc. v.

---

**5.** "The FCC makes no claim that the FCA supercedes the Bankruptcy Code." FCC Memorandum in Opposition at 11 ftn. 3.

**6.** The legislative history states:

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization

plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin. News p. 6296, reprinted in Collier on Bankruptcy App. Pt. 4(d)(i); S.Rep. No. 989, 95th Cong., 2d Sess. 54–55 (1978), U.S.Code Cong. & Admin. News pp. 5840-5841, reprinted in Collier on Bankruptcy App. Pt. 4(e)(i).

*Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir.1987) ("actions taken in violation of the stay are void and without effect" (quoting *Collier on Bankruptcy*)), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988). *See also Shimer v. Fugazy Express, Inc. (In re Fugazy Express, Inc.)*, 114 B.R. 865, 873 (Bankr.S.D.N.Y.1990) ("[s]ince § 362 of the Code stays all enforcement activity automatically, the 1988 FCC letter [purportedly canceling the license] is accordingly without effect" (citing *In re Garnett*, 47 B.R. 170, 171 (Bankr. E.D.N.Y.1985) ("[t]he action of a party in violation of the stay without court approval is void and without effect"))), *aff'd*, 124 B.R. 426 (S.D.N.Y.1991).

The automatic stay is embodied in 11 U.S.C. § 362(a). Section 362(a) provides as follows, in relevant part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301 ... of this title ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation ... of a[n] ... administrative, or other action or proceeding against the debtor ... to recover a claim against the debtor that arose before the commencement of the case under this title;

· * * *

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to ... enforce any lien against property of the estate;

(5) any act to ... enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

■ All of the quoted subsections of Section 362(a) are implicated by the FCC's issuance of the January 12 Declaration. There can be no question that the FCC's act is claim-based——the January 12 Declaration of cancellation was explicitly and exclusively predicated upon NextWave's failure to make timely payment of installments due post-petition on the FCC's pre-petition claim under the Notes. There can be no doubt that the Licenses constitute "property of the estate" under Section 541 of the Bankruptcy Code.[7] The January 12 Declaration implicates subsections (1) and (6), and it unarguably violated subsections (3), (4) and (5).

---

7. The FCC has never argued that the licenses are not property of the estate. Section 541 is broadly construed to encompass all conceivable interests of the debtor in property, *United States v. Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Although the Circuit Court Decision stated in a different context that a license "does not convey a property right" in the traditional sense (200 F.3d at 51), the law is clear that possessory and intangible interests in general and FCC licenses in particular do constitute property of the estate in bankruptcy. *See e.g., In re Central Arkansas Broadcasting Company*, 68 F.3d 213, 214 (8th Cir.1995) (interests of debtor in FCC license property of the estate); *In re Tak Communications Inc.*, 985 F.2d 916 (7th Cir. 1993) (same); *In re PBR Communications Systems, Inc.*, 172 B.R. 132, 134 (Bankr. S.D.Fla.1994) (same); *In re Ridgely Communications, Inc.*, 139 B.R. 374 (Bankr.D.Md. 1992) (same); *Shimer v. Fugazy Express, Inc. (In re Fugazy Express, Inc.)*, 114 B.R. 865, 870–71 (Bankr.S.D.N.Y.1990), *aff'd*, 124 B.R. 426 (S.D.N.Y.1991) (same). Upon the grant of the licenses, the debtors were required to execute not only the Notes but security agreements giving the FCC "a first lien on and continuing security interest in all of the Debtor's rights and interests in the License and all proceeds, profits and products of any sale of or other disposition thereof...." The FCC filed UCC financing statements in several jurisdictions, putting the world on notice of its security interest in the licenses. A "security interest" is an "interest in property obtained pursuant to a security agreement." *Black's Law Dictionary* (6th ed.1990) at 1357. Uniform Commercial Code § 1–201(37) provides "'Security Interest' means an interest in personal property or fixtures which secures payment or performance of an obligation."

Accordingly, the January 12 Declaration was void.

## B. *The right to cure defaults and reinstate obligations to avoid forfeiture and facilitate reorganization*

One of the essential objectives of the automatic stay under Section 362(a) is to avoid the effective nullification of other provisions of the Bankruptcy Code designed to facilitate the central Code objective of reorganization, including the right to cure defaults under Sections 1123(a)(5)(G) and 1124(2)(A). Section 1123(a)(5)(G) provides that "a plan shall ... (5) provide adequate means for the plan's implementation, such as ... (G) curing or waiving any default." Section 1124(2)(A) expressly contemplates a plan which "(A) cures any such default that occurred before or after the commencement of the case under this title," and this applies "(2) notwithstanding any contractual provision *or applicable law* that entitles" a creditor to demand or receive accelerated payment.

Thus, even if there was a default in the "timely" payment of installments under the Notes, the Bankruptcy Code explicitly provides for the right to cure the default and reinstate the obligation. The "cure," although not defined, is "reversal" of the event that triggered the default and a return to a pre-default status quo. *DiPierro v. Taddeo (In re Taddeo)*, 685 F.2d 24, 26–27 (2d Cir.1982); *In re Liberty Warehouse Assocs. Ltd. Partnership*, 220 B.R. 546, 548 (Bankr.S.D.N.Y.1998) ("Under § 1124(2), a debtor can cure its prepetition default under a note or other debt instrument"). As concisely stated by the Second Circuit, "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified." *Taddeo*, 685 F.2d at 27.

Although *Taddeo* was a Chapter 13 case, its holding applies with equal force in the Chapter 11 context, as the language in both Chapters is substantially similar. *Compare* 11 U.S.C. § 1322(b)(5) (stating that a chapter 13 plan may "provide for the curing of any default within a reasonable time....") *with* 11 U.S.C. § 1123(a)(5) (quoted above) *and* 11 U.S.C. § 1124(2)(A) (quoted above) *and* 11 U.S.C. § 1222(B)(5) (stating that a plan may "provide for the curing of any default within a reasonable time...."). Furthermore, the concept of "cure" and/or reinstatement appears throughout the Bankruptcy Code and is globally intended to permit a debtor to put the debt in question back on track and effect a reorganization. *See* 11 U.S.C. §§ 365(b)(1),[8] 1110(a)(1)(B),[9] 1168(a)(1)(B),[10] and the sections cited and quoted above. This concept and the intent behind it is borne out by the legislative history to Section 1124(2), which states that

*a claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default.* The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. *The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain.* Curing of the default and the assumption of the debt in accordance with its terms is an important reorgani-

---

8. Providing that if there has been a default in an executory contract or unexpired lease, in order to be assumed, the trustee must "cure[ ] or provide[ ] adequate assurance that the trustee will promptly cure, such default."

9. Allowing secured party to take possession of aircraft equipment and vessels unless a de-

fault under the security agreement, lease or contract is cured.

10. Allowing secured party to take possession of rolling stock or accessories thereto unless a default under the security agreement, lease or contract is cured.

zation technique for dealing with a particular class of claims, especially secured claims.

S.Rep. No. 989, 95th Cong., 2d Sess. 120 (1978), U.S.Code Cong. & Admin. News p.5906 (emphasis supplied). "In short, 'curing a default' in Chapter 11 means ... the event of default is remedied and the consequences are nullified." *Taddeo*, 685 F.2d at 29.

No more dramatic exemplar of the rehabilitative objectives of the "cure" provisions of the Bankruptcy Code could be imagined than this very case. NextWave has proposed in its Modified Plan to pay upon confirmation all amounts accrued and owing to the FCC through the date of confirmation (including installment payments, interest, late charges and penalties), reinstate the payment schedule initially agreed to with the FCC and specified in the Notes, and pay all unsecured creditors, *in full*. If the statutory right to cure were not honored and the FCC were permitted to reclaim NextWave's licenses by retroactive forfeiture, the result would be economic catastrophe for the holders of $627 million of secured and unsecured debts and the probable destruction of any value in NextWave for equity holders who invested $420 million. The FCC itself would forfeit for the public full payment of the entire $4.7 billion bid by NextWave for the C Licenses, plus interest and late fees. Perhaps the FCC speculates it may achieve a greater financial return for the public in the scheduled July 26 auction of NextWave's licenses, but that is an equation expressly forbidden by the governing statute, FCA § 309(j)(7)(A), discussed in point IV, below.

### C. *The prohibition against discriminatory treatment*

For this Court to give legal effect to retroactive cancellation of the Licenses would effectively validate the functional equivalent of an *ipso facto* provision (also referred to as a bankruptcy default provision), which serves to inflict a penalty or forfeiture on a debtor for exercising a Federal right. *Taylor v. Albany Employees Federal Credit Union (In re Taylor)*, 146 B.R. 41, 46–47 (M.D.Ga.1992) (holding *ipso facto* clauses invalid as a matter of law because they serve to penalize debtors from exercising their federal right to file for bankruptcy), *rev'd on other grounds*, 3 F.3d 1512 (11th Cir.1993); *Riggs Nat'l Bank of Washington, D.C. v. Perry (In re Perry)*, 29 B.R. 787, 790–91 (D.Md.1983) (holding that *ipso facto* clauses are unenforceable as a matter of law because they unfairly tip the scale in favor of creditors by effectively granting automatic relief from the automatic stay), *aff'd*, 729 F.2d 982 (4th Cir.1984); *General Motors Acceptance Corp. v. Rose (In re Rose)*, 21 B.R. 272, 275–79 (Bankr.D.N.J.1982) ("Enforceability of these clauses would, in effect, render a penalty on debtors." *Id.* at 277). *See also* 7 *Collier on Bankruptcy* ¶ 1124.03[2] at p. 1124–10 (15th Ed. rev. 1999) (stating that Section 1124(a)(2) of the Bankruptcy Code "permits the plan to reinstate the maturity of a claim or interest without curing any defaults with respect to the financial condition of the debtor that are included in the Section 365(b)(2)(A) *ipso facto* clauses. This interpretation of Section 1124(a) is correct").

Section 525(a) of the Bankruptcy Code is a statutory companion of the foregoing principle. Section 525(a) prohibits a governmental unit from revoking a license in retaliation for commencement or prosecution of a bankruptcy case or the alleged nonpayment of a pre-petition claim. The statute provides, in relevant part:

(a) Except as provided in [not applicable], a governmental unit may not deny, revoke, suspend or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against ... a person that is or has been a debtor under this title ... or another person with whom such debtor has been associated, solely because such bankrupt or debtor is or has been a

debtor under this title ... or has not paid a debt that is dischargeable in the case under this title....

See, e.g., In re Bill, 90 B.R. 651, 658 (Bankr.D.N.J.1988) (suspending driver's license for failure to pay surcharge violated § 525); In re The Bible Speaks, 69 B.R. 368, 373 (Bankr.D.Mass.1987).[11] It is well recognized that "[t]he prohibition against discrimination based upon the filing of a bankruptcy case necessarily extends to discrimination based upon automatic or likely consequences of such filing." 4 Collier on Bankruptcy ¶ 525.02[1] at pp. 525–7.

It appears that the FCC has violated Section 525 in its attempt to retroactively cancel the Licenses. The apparent discrimination is alleged in two forms.

One form is the alleged differences in treatment of NextWave, on the one hand, and other C block and other spectrum license holders, on the other, summarized in the submission of debtors' counsel. To establish this form of discrimination would require discovery proceedings and an evidentiary hearing to afford both sides procedural due process.

The other form of discrimination appears from the facts which are before the Court. After a year of intense litigation the FCC has been vindicated in the Court of Appeals in its contention that a regulatory purpose was implicit in the "full payment requirement" in the FCC regulations. That regulatory objective is fulfilled in the debtors' modified Plan now awaiting a confirmation hearing. It would have been more than fully served under the NextWave proposal of January 11 to pay the entire $4.3 billion outstanding obligation in a lump sum upon confirmation, rather than in installments over the next seven years. As further amplified under point IV, below, the FCC has not and cannot articulate any regulatory interest entailed in the "timely payment" requirement for the modest delay in interest and installment payments to date. The "timely payment" requirement is purely economic (i.e., the time value of money), and the economic consequence of delay will be fully cured by payment in full of all applicable interest, penalties and late fees upon confirmation under the debtor's modified Plan, if the Plan is ever allowed to reach a confirmation hearing and is confirmed.

Lacking any comprehensible regulatory objective, one must consider the consequences of the FCC's January 12 Declaration. As stated by the FCC in its Objection to confirmation, reorganization of NextWave without the Licenses would be impossible, and the debtors' assets would likely be liquidated and sold in Chapter 7. Equity investors could suffer a total loss on their investments aggregating $420 million. Secured and unsecured debt aggregating $627 million might recover a small percentage. The FCC (or rather, the public fisc) may also suffer economically, perhaps severely. The proposed July 26, 2000 reauction of NextWave's C and F Licenses will be open only to "designated entities" qualified to bid for C and F block spectrum under the FCC's regulations. Designated entities are by definition start-up, entrepreneurial entities and regional telephone companies lacking the financial resources of the major players in the wireless market, such as AT & T, Sprint and Nextel. In the 1999 reauction of predominantly C block spectrum, 34 licenses received no bids, and the rest were sold at values equating to a small fraction of the approximately $4.7 billion plus interest and

---

11. Stating that:

It is not consistent with the statute to permit the Board to act based upon a Chapter 11 school's insolvency merely because it takes such action with respect to all schools who are insolvent, whether they are inside or outside of bankruptcy. Such an interpretation preserves the "fresh start" policy of the Bankruptcy Code. It prevents the Debtor's present financial difficulties from being the charter for his future. It also promotes the policy of allowing the Debtor breathing room and a respite from outside pressure.

The Bible Speaks, 69 B.R. at 373 (footnote omitted).

late fees to be paid by NextWave under its modified Plan.

Finally, one of the important statutory objectives of FCA § 309(j), rapid deployment and utilization of C and F block spectrum by designated entities, would be undermined by cancellation and reauction of the Licenses. Judging by the C, D, E and F block auctions, it is highly unlikely that licenses auctioned beginning on July 26, 2000 would result in final grant of the Licenses to the high bidders before winter or spring 2001, at which time the designated entity licensees would have to raise the necessary funding to begin building out their PCS systems. NextWave is a designated entity. It was awarded the Licenses in January 1997. It represents that it has already developed the necessary infrastructure to a considerable degree. It is prepared to put the Licenses into use almost immediately. And all this must be considered in light of the fact that PCS and wireless telephony is developing at lightning speed, such that another year's delay is of great significance.

These facts would appear to present a clear and convincing *prima facie* case of retaliation in violation of Section 525. However, I am reluctant to make a finding that an agency of the United States Government has acted with *mala fides* in the conduct of its statutory duties without giving the FCC a further opportunity to present evidence and argument in support of a good faith, non-retaliatory explanation for its actions and, correspondingly, counsel for NextWave an opportunity to examine into the Agency's motivation through appropriate discovery. Accordingly, I shall not rule upon the debtors' argument under Section 525. In the hope that a ruling may be rendered unnecessary by the course of events, I shall order the parties to desist from further proceedings in respect of Section 525 until one side or the other makes an appropriate request on the record, either orally or in writing, to re-open the issue.

## D. *The FCC's bankruptcy law contentions*

The FCC's contention that the January 12 Declaration did not constitute an "act" violating the automatic stay within the meaning of subsections (3), (4) and (5) of Section 362(a) because the cancellation was "automatic" as of late 1988 or January 1999 does not withstand analysis. As already explained, even if the cancellation were truly "automatic" it would mean nothing unless the FCC did something to "exercise control over," or "enforce [its] lien against" the Licenses. Until the FCC took an affirmative "act" with respect to the Licenses——the January 12 Declaration——no one even knew of the putative cancellation, and all parties (including the FCC) and all three Federal courts proceeded upon the assumption that the Licenses were the property of the NextWave estate. The FCC's argument is too facile. A first-time act of dominion over property of the debtors' estate cannot be exempted from the operation of Section 362(a) by an expedient, post hoc assertion that no present act occurred because it all happened "automatically" more than a year ago.

The automatic stay is broadly written and broadly construed. Section 362(a)(3), (4) and (5) stay "*any* act" to obtain possession of, exercise control over, or enforce a lien against, property of the estate. *Delpit v. Commissioner of Internal Revenue Service,* 18 F.3d 768, 771 (9th Cir.1994) ("[s]ection 362 'is exceedingly broad in scope' and 'should apply to almost any type of formal or informal action against the debtor or the property of the estate' " (quoting *Collier on Bankruptcy* )). There is no dispute that it applies to the Federal government and its agencies, such as the IRS and the FCC. *Fugazy Express,* 114 B.R. at 872–73 ("at the time of the filing the License was property of the Debtor's estate and had remained so. The FCC was subject to the automatic stay and precluded from rendering any administrative cancellation of the License once the Debtor filed a petition in bankruptcy. . . .

Thus, the License remained property of the estate, even though administratively it became subject to cancellation." *id.* at 873).

Contrary to the FCC's arguments (and the *Gull Air* and *Yellow Cab* decisions, discussed above), there is substantial authority holding that regulatory provisions which interfere with property of a debtor's estate, even by "automatic" operation of the regulation, violate the automatic stay. *See, In re American Central Airlines, Inc.,* 52 B.R. 567, 569–571 (Bankr. N.D.Iowa 1985) (stating that, with respect to administrative action to reallocate FAA landing slots, "[t]he mere fact that an interest exists by the grace of government no longer precludes the interest from being treated as a property right," *id.* at 571, and holding that "any act to enforce this [use it or lose it] contractual provision against the Debtor's will constitutes an act to obtain possession of property of the estate and an attempt to exercise control over property of the estate," *id.* at 570, and an "unlawful act" in violation of 11 U.S.C. § 362(a)(3), *id.* at 571). "[R]egulatory provisions in direct conflict with control of the property [of the debtor's estate] by the Bankruptcy Court violate the automatic stay." *In re National Cattle Congress, Inc.,* 179 B.R. 588, 597 (Bankr. N.D.Iowa 1995) (citing *MCorp. Financial Inc. v. Board of Governors of Federal Reserve System,* 502 U.S. 32, 39, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) and *Missouri v. U.S. Bankruptcy Court,* 647 F.2d 768, 776 (8th Cir.1981), *cert. denied,* 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986)), *remanded on other grounds,* 91 F.3d 1113 (1996). Under this authority, an FCC regulation effecting automatic cancellation of a debtor's property rights by reason of any default would itself violate the automatic stay.

■ Furthermore, the term "act" as employed in Section 362 must be broadly construed to include the failure to stop actions that could have been stopped. 3 *Collier on Bankruptcy* ¶ 362.03[8] at 362–63 (15th Ed. rev.1999); *see In re Hellums,*

772 F.2d 379 (7th Cir.1985); *In re Sucre,* 226 B.R. 340, 347 (Bankr.S.D.N.Y.1998) (creditor has affirmative duty to discontinue garnishment action). The FCC certainly had the discretionary authority to take any number of actions to avert or delay the purported automatic cancellation (*see* discussion under the heading The Alleged "Automatic" Cancellation, above), including simply not issuing the January 12 Declaration. The FCC's decision to issue the January 12 Declaration was not "automatic."

And, as already noted, but for the FCC's affirmative act in issuing the January 12 Declaration, all parties and the Courts would have proceeded, as they have throughout these proceedings, upon the assumption that the Licenses were not cancelled and remained the property of NextWave. Thus, in the real world it did require an "act" to give effect to the putative automatic cancellation, and that act violated the automatic stay.

Finally, it cannot be overemphasized that the FCC itself has repeatedly acknowledged that the automatic stay applies to the automatic cancellation provisions of its regulations, and that the automatic stay precludes automatic cancellation in the absence of an order of the Bankruptcy Court lifting the stay. No better evidence of this can be found than in the motion to lift the automatic stay which the FCC actually did make in late May 1999, and which was the subject of *NextWave V.* The Memorandum of Law in support of the FCC's Motion to Lift Automatic Stay, dated May 28, 1999, expressly acknowledged that the automatic stay "is currently in place pursuant to 11 U.S.C. § 362(a)" (p. 1) and continued:

> Accordingly, the FCC respectfully submits that "cause" exists under section 362(b)(1) for the Court to lift the automatic stay *so that* the regulations' *automatic cancellation* provisions *may take effect.*

*Id.* at 2; emphasis supplied. The concluding lines in the FCC's Memorandum state:

> For the reasons stated above, the Court should grant the FCC's motion to lift the automatic stay *so that the Licenses may cancel automatically.*

*Id.* at 4; emphasis supplied.[12]

▇ The FCC was correct in May 1999——Section 362(a) does indeed require a court order lifting the automatic stay before the "automatic cancellation provisions may take effect . . . so that the Licenses may cancel automatically." No such order was granted in June 1999, and none was sought prior to the January 12 Declaration. Both the January 12 Declaration and the purported automatic retroactive cancellation of the Licenses are violations of the automatic stay.

The FCC's contention that its action was somehow shielded under the "governmental" exception to the automatic stay found in Section 362(b)(4) is not well-founded. Section 362(b)(4) provides:

> (b) The filing of a petition under . . . , does not operate as a stay—
>
> (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power

In interpreting this recently amended provision's exception of the automatic stay to a governmental exercise of "police and regulatory" power, case law developed under former Sections 362(b)(4) and (5) remains as viable guidance. *In re Mohawk Greenfield Motel Corp.*, 239 B.R. 1, 5 at n. 6 (Bankr.D.Mass.1999) citing 3 *Collier on Bankruptcy* ¶ 362.05[5][b] (16th Ed.1999) and 2 Norton Bankruptcy Law and Practice 2d § 36.18 (1999).

▇ The legislative history of Section 362(b)(4) is instructive as to the meaning of "police and legislative power." The House Report on the 1978 Reform Act states:

> paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety or similar police or regulatory laws or attempting to fix damages for violation of such law, the action or proceeding is not stayed under the automatic stay.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 343 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 51–52, reprinted in 1978 U.S.C.C.A.N. 5787, 5838, 5963, 6299. Rep-

---

**12.** For other judicial acknowledgments by the FCC that a motion would be necessary to revoke or cancel NextWave's Licenses, *see, e.g.*:

- FCC Memorandum dated in May 1998 in support of motion to disqualify NextWave's counsel, at page 21, footnote 5, referring to "any motion by the FCC to lift the automatic stay for the purposes of revoking NextWave's C block licenses."
- Statements by FCC counsel in arguments before District Judge Parker on November 9, 1998: "During the pendency of the bankruptcy, the Bankruptcy Court and the automatic stay would hold the creditors at bay, including the Federal Communications Commission" (Tr. 5), and be-

fore this Court on November 12, 1998 "The regulations provide that upon failure to make the payments the license is automatically cancelled. *That hasn't (happened) in this case due to the automatic stay* " (Tr. 30, emphasis supplied).

- With respect to the F block licenses, statement by FCC counsel on May 26, 1999 before this Court "There is no trigger for the automatic cancellation that I understand to date with regard to the F-block licenses. As I understand it, they can comply with their payment obligations, they may well be in a position to reorganize around their F-block property" (Tr. 17).

resentative Edwards' and Senator DeConcini's comments further clarify that Section 362(b)(4) must "... be given a narrow construction ... and not ... apply to actions by a governmental unit *to protect a pecuniary interest in property of the debtor or property of the estate.*" P.L. 95–598, 1978 U.S.C.C.A.N. 5787, 6444–45, 6513. (emphasis supplied)

Thus, the test to determine if this narrow exception applies is whether the governmental action is in pursuance of a pecuniary purpose or public policy. *In re Dunbar,* 235 B.R. 465, 471 (9th Cir. BAP 1999). Under the pecuniary purpose test, Section 362(b)(4) will not except the automatic stay where "government action relates 'primarily to the protection of the government's pecuniary interest in the debtor's property' ... pursued 'solely to advance a pecuniary interest of the governmental unit.'" *Id.* citing *Universal Life Church, Inc.,* 128 F.3d 1294, 1297, 1299 (9th Cir.1997), *cert. denied,* 524 U.S. 952, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998). The public policy test, however, examines whether the governmental action is in furtherance of matters of public policy or merely the adjudication of private rights as between the government and the debtor. *In re Dunbar,* 235 B.R. at 471. ("Where the agency's action affects only the parties immediately involved in the proceedings, it is exercising a judicial function and the debtor is entitled to the same protection from the automatic stay as if the proceeding were being conducted in a judicial forum."). *See also, In re Fugazy Express, Inc.,* 124 B.R. 426 (S.D.N.Y.1991), *appeal dismissed,* 982 F.2d 769 (2d Cir. 1992) (retroactive cancellation of license by FCC not shielded by Section 362(b)(4) since action did not impact the health or safety of the public).

Section 362(b)(4) is not applicable here. The FCC's action is nothing other than a direct attempt to enforce its pecuniary interests. The stated premise of the FCC's action is the debtors' post-petition payment default. The FCC has attempted to exercise a self-help remedy for a purely financial default under the guise of a regulatory act. As noted by the Second Circuit in *Fugazy,* which also dealt with a purported FCC automatic retroactive cancellation:

> Nothing in the Code suggests that a party is entitled to engage in "self-help" in derogation of the automatic stay. *See In re Computer Communications, Inc.,* 824 F.2d 725, 731 (9th Cir.1987) ("Judicial toleration of an alternative procedure of self-help and post hoc justification would defeat the purpose of the automatic stay").

*In re Fugazy Express, Inc.,* 982 F.2d at 776.

The FCC acted as a creditor, and as discussed elsewhere in this decision, not in any regulatory capacity. Thus, the FCC's citations to *In re Gull Air, Inc., supra,* and *In re Yellow Cab Co-op. Ass'n, supra,* are unpersuasive because these cases consider issues pertaining to regulatory non-use conditions, not vindication of the government's pecuniary interest.

## II. *There can be no "default" for failure to make a payment precluded under the Bankruptcy Code*

At the core of this matter is the FCC's attempt to invoke a self-help remedy for the debtors' post-petition default on a pre-petition claim. The petition date is June 8, 1998. The January 12 Declaration recites "delinquencies" in payment more than 90 days from July 31, 1998, delinquencies clearly falling within the post-petition period and clearly arising from the January 3, 1997 Notes. "A claim is not rendered a post-petition claim simply by the fact that time for payment is triggered by an event that happens after the filing of the petition." *In re Oxford Management, Inc.,* 4 F.3d 1329, 1335 n. 7 (5th Cir.1993).

Any notion of a legally cognizable "default" presupposes that the debtors could have lawfully made post-petition payments to the FCC in the first instance.

As a matter of fundamental bankruptcy law, the debtors could not have made post-petition payments on account of this pre-petition claim absent an order of this Court, after notice and a hearing according due process to all affected parties. *See* 11 U.S.C. §§ 102(1) and 363.

 Section 363(b)(1) authorizes the debtors, through application of Section 1107(a), to "use, sell, or lease, other than in the ordinary course of business, property of the estate," but only *after* notice and a hearing. "Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting se-cured creditors and others from dissipation of the estate's assets." *In re Lavigne,* 114 F.3d 379, 384 (2d Cir.1997) citing *In re Roth American,* 975 F.2d 949, 952 (3d Cir.1992) and quoting *In re H & S Trans-portation Co., Inc.,* 115 B.R. 592, 599 (M.D.Tenn.1990). Section 1108 authorizes the debtors to operate the business, and therefore Section 363(c)(1) allows the debt-ors "unless the court orders otherwise, . . . [to] enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and [to] use property of the estate in the ordinary course of business without notice or a hearing." *In re Lavigne,* 114 F.3d 379, 384 at n. 3; 11 U.S.C. § 363(c)(1).

 The debtors' business (recognizing that it is still a start-up company) is "to build and operate [PCS] systems in geo-graphical areas referred to as Basic Trad-ing Areas ('BTAs'), and to provide wireless Internet access and voice services to a broad range of distribution partners." *First Amended Disclosure Statement,* dat-ed July 27, 1999 at 5. Courts commonly apply the "horizontal" and "vertical" test to determine whether a transaction is "or-dinary." *See In re Lavigne,* 114 F.3d at 384. But neither test is apposite here. In no way could it have been the ordinary course of NextWave's business to make payments on the $4.7 billion pre-petition

claim of the FCC post-petition, even if that claim had not been challenged as a fraudu-lent conveyance in a hotly contested adver-sary proceeding. Even ordinary course creditors (such as inventory or parts sup-pliers, utilities and the like) cannot be paid their pre-petition claims without a court order. It is fundamental in a Chapter 11 case that the pre-petition claims of all creditors, whether coming ·due pre- or post-petition, get paid only by court order or in accordance with a court-confirmed plan of reorganization. As aptly expressed in *In re H & S Transportation Co., Inc.:*

> Thus, the authorization in § 363 that the trustee may use property of the estate in the "ordinary course of business" without notice or a hearing cannot be construed to permit payments that frus-trate the theory and philosophy of the Bankruptcy Code. *Pressman v. Bank of St. Louis (In re J.T.L., Inc.),* 36 B.R. 860, 862 (Bankr.E.D.Mo.1984). *See Em-ployee Transfer Corp. v. Grigsby (In re White Motor Corp.),* 831 F.2d 106 (6th Cir.1987) (does not authorize conversion of prepetition debt to postpetition debt); *Lopa v. Selgar Realty Corp. (In re Sel-gar Realty Corp.),* 85 B.R. 235, 240 (Bankr.E.D.N.Y.1988) (does not autho-rize sale of primary asset without notice and hearing); ... *J.T.L.,* 36 B.R. at 862 (does not authorize postpetition payment of interest on prepetition note). Rather, the Court must interpret whether pay-ments were made in the "ordinary course of business" with sensitivity to the Code's overriding policy of maximiz-ing the value of the debtor's estate for the benefit of the creditors.

115 B.R. at 599. Actions which violate Section 363 are "void." *In re Lavigne,* 114 F.3d at 385 (purported cancellation of poli-cy was void as an extraordinary disposition of property of the estate without notice or hearing). Any unauthorized post-petition payments to the FCC on account of its pre-petition claim would be avoidable at the instance of the debtors or other credi-tors as an unauthorized post-petition

transfer under Section 549. *See* 11 U.S.C. § 549(a)(1)(B) ("the trustee may avoid a transfer of property of the estate ... that occurs after the commencement of the case; and ... that is not authorized under this title or by the court").

It is senseless to speak of a "default" when, as a matter of bankruptcy law, the debtors had neither the authority nor the ability to make such payments absent notice and court approval. This is not a case where the FCC is entitled to post-petition payments on the Notes because it has shown that it needs adequate protection of its lien, *see* 11 U.S.C. §§ 361 and 362(d)(1), or that the value of its lien is in any way impaired. The FCC can point to no provision of the Bankruptcy Code that accords it a right to "timely" payment of post-petition delinquencies, such as a commercial landlord may claim under Section 365(d)(3). The FCC must, like other creditors, go through the plan process and have its claim administered under the Bankruptcy Code. The FCC could have applied to this Court to compel NextWave to make post-petition payments. But it did not do so.

Indeed, had the FCC ever made the debtors aware that it stood ready to enforce cancellation of the debtors' principal assets, the debtors could have applied to this Court under Section 363, or possibly even Section 105 under the necessity of payment doctrine, or the debtors could have attempted to arrange DIP financing to pay the amounts and sought approval under Section 364. But the FCC never did so.

The protection due the FCC under the Bankruptcy Code exists in the debtors' Plan. The FCC will be paid in full, the putative "defaults" cured and nullified. No creditor can ask for better protection, in or out of bankruptcy. The FCC cannot stand upon 47 C.F.R. § 1.2110(f)(4)(iv) to suborn Title 11:

> It is a fundamental principle of American law that legislative statutes take precedence over conflicting administrative regulations. *See, e.g., Caldera v. J.S. Alberici Constr. Co.*, 153 F.3d 1381, 1383 n. ** (Fed.Cir.1998) ("Statutes trump conflicting regulations"); *Wolf Creek Collieries v. Robinson*, 872 F.2d 1264, 1267 (6th Cir.1989) ("statutory language ... prevail[s] over inconsistent regulatory language"); *Pacific Gas and Elec. Co. v. United States*, 664 F.2d 1133, 1136 (9th Cir.1981) ("a regulation which operates to create a rule out of harmony with the statute, is a mere nullity") (citing *Manhattan Gen. Equip. Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936)); *United States v. Gordon*, 638 F.2d 886, 888 (5th Cir.1981) ("Whatever effect the agency regulation may have under other circumstances, it cannot supersede a statute applicable to those present here").

*Furlow v. United States*, 55 F.Supp.2d 360, 364–65 (D.Md.1999) (Treasury Department regulation impermissibly conflicting with 26 U.S.C. § 151).

■ There exists a host of protections, not only for the benefit of the debtors, but for the benefit of all constituent parties including the FCC, designed to ensure the rational, systematic and equitable reorganization of this estate. Self-help repossession by ambush is not one of them——it is repugnant to the very essence of the Bankruptcy Code.

**III.** ***The January 12 Declaration of automatic cancellation is barred by the doctrines of equitable estoppel and waiver***

■ The January 12 Declaration and the FCC's position on this motion are confounded by the FCC's prior course of conduct and statements throughout these proceedings. Consider, for example, the following FCC quotations (emphasis supplied in each quotation):

● As early as July 13, 1998, the FCC argued: "The bankruptcy code also excepts from its automatic stay provi-

sions 'the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.' 11 U.S.C. § 362(b)(4). *Under this provision, however, an agency's enforcement of a final regulatory order against a bankrupt is subject to the automatic stay, and the bankrupt retains its right to challenge any such order in the appropriate forum. See Board of Governors of the Federal Reserve Sys. v. MCorp Financial, Inc.,* 502 U.S. 32, 41, 44–45, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). Thus, despite the necessary dismissal of this adversary proceeding for lack of subject matter jurisdiction, *NextWave will still enjoy bankruptcy protection from collection of C block license payments pending reorganization of its business affairs. See NLRB v. 15th Avenue Iron Works, Inc.,* 964 F.2d 1336, 1337 (2d Cir.1992)." [13]

- "Because the FCC provided certain confidential information to WG & M, WG & M should also be disqualified from defending NextWave against *any motion by the FCC to lift the automatic stay for the purposes of revoking NextWave's C block licenses.*" [14]

- "Mr. Alter: The motion that is being made by the Federal Communications Commission is not by any means to bar this debtor from getting relief in bankruptcy. *During the pendency of the bankruptcy, the Bankruptcy Court and the automatic stay would hold the creditors at bay, including the Federal Communications Commission.*" [15]

- "[Mr. Alter]: The regulations provide that upon failure to make the payments the license is *automatically cancelled. That hasn't (happened) in this case due to the automatic stay . . . .* " [16]

- "Mr. Alter: . . . [T]hey [NextWave] are still quite a substantial company and *[the FCC has] not challenged their payment obligation under the F-block license. There is no trigger for the automatic cancellation that I understand to date with regard to the F-block licenses.* As I understand it, if they can comply with their payment obligations, they may well be in a position to reorganize around their F-block property." [17]

- "[T]he radio spectrum licenses (*the "Licenses"*) issued by the FCC to the NextWave Debtors . . . *would be transferred directly to Nextel or one or more of its subsidiaries identified by Nextel in its transfer application relating to the Licenses . . . .*" [18]

- "To provide the consideration for the transfer of substantially all of *the assets of the NextWave Debtors, including the Licenses, to Nextel . . . .*" [19]

- "The approval of the transfer of *the NextWave Debtors' assets* to Nextel . . . will be submitted to and subject to the approval of the Bankruptcy Court." [20]

**13.** Memorandum of Law in Support of FCC's Motion for Mandatory Withdrawal of the Bankruptcy Court Reference and Dismissal of NextWave's Adversary Proceeding (Adversary Doc. No. 5) (the "Dismissal Memorandum") at 18 n. 5.

**14.** Memorandum of Law in Support of FCC's Motion to Disqualify Weil Gotshal & Manges as NextWave's Counsel dated July 22, 1998, at 21–22 n. 5.

**15.** Transcript of Proceedings before the District Court, November 9, 1998, at 5.

**16.** Transcript of proceedings before the Bankruptcy Court, November 12, 1998, at 30. The transcript erroneously attributed this quotation to the Court.

**17.** Transcript of proceedings before the Bankruptcy Court, May 26, 1999, at 17.

**18.** Term Sheet for Comprehensive Settlement Agreement and Joint Plan of Reorganization ("Term Sheet") dated August 10, 1999, p. 1 at ¶ I(B).

**19.** Term Sheet p. 4 at ¶ III(A).

**20.** Term Sheet p. 6 at ¶ III(D).

- "This letter responds to your letter of September 9, 1999, which requested additional information on the agreement reached between the FCC staff, the Department of Justice ("DOJ") and Nextel on the terms under which the government would support an alternative bankruptcy reorganization plan proposed by Nextel Communications, Inc. ("Nextel") for *the PCS licenses now held by NextWave* Personal Communications, Inc. ("NextWave").

\* \* \* \* \* \*

As reflected in the term sheet, if the bankruptcy court approves the Nextel plan, then the FCC's General Counsel agreed to recommend that the full Commission grant a waiver of the C and F block eligibility rules to allow a transfer of *NextWave's licenses* to Nextel pursuant to a court-approved reorganization plan." [21]

- "The Federal Communications Commission ("FCC") respectfully submits this memorandum of law in support of its motion pursuant to 11 U.S.C. § 362(d)(1) ("section 362(d)(1)") and Rule 4001 of the Federal Rules of Bankruptcy Procedure for an order lifting *the automatic stay* in the above captioned bankruptcy case, *which is currently in place* pursuant to 11 U.S.C. § 362(a).

\* \* \* \* \* \*

Accordingly, the FCC respectfully submits that "cause" exists under section 362(d)(1) for the Court to *lift the automatic stay so that the regulations' automatic cancellation provisions may take effect.*" [22]

Aside from these and many other similar oral and written statements by the FCC, the FCC's entire course of conduct (*i.e.,* what the government did, and did not do) right up to the January 12 Declaration is consistent with only one set of assumptions: NextWave "would enjoy bankruptcy protection from collection of C block license payments pending reorganization of its business affairs"; the automatic stay would "hold the creditors at bay, including the [FCC]"; the automatic stay, "currently in place," precluded the automatic cancellation of NextWave's licenses without prior application to the Bankruptcy Court; NextWave continues to hold the licenses as part of its assets which the FCC negotiated to transfer to Nextel under a "Term Sheet for Comprehensive Settlement Agreement and Joint Plan of Reorganization."

All parties in interest, *including the FCC,* conducted themselves in a way which clearly demonstrated reliance upon these assumptions. Consider the following:

- Nearly $10 million has been expended by lawyers and other professionals for the parties (not including the FCC).

- NextWave engaged in an entire trial of and subsequent appeals in the Adversary Proceeding (including to the Second Circuit).

- Approval of the Disclosure Statement, solicitation of creditors, the original scheduling of confirmation and its stay by the Second Circuit took place.

- DIP Lenders have extended $35 million credit secured by assets including the F Licenses relying upon prior representations and conduct of the FCC.

- The Official Creditor's Committee, which represents more than $500 million of creditors "relied extensively upon those representations [by the FCC] in conducting itself in these cases. The Committee represents that had it any inkling that the FCC viewed the licenses as subject to automatic cancellation for non-payment, it would certainly have sought judicial

---

21. Letter dated September 27, 1999 from the FCC Chairman to Representative Tom Bliley.

22. May 28, 1999 Memorandum of Law in Support of FCC's Motion to Lift Automatic Stay at 1–2.

determination of this issue before the first payment was past due."[23]

- "Had the Debtors and their creditors known that they would forfeit almost $500 million in License downpayments and the Licenses, thus wiping out any chance for recovery on the hundreds of millions in claims, by failing to make interest payments on pre-petition debt in bankruptcy, they would have made every effort to come up with the money while the reorganization effort continued".[24]

- Extensive litigation with Nextel, some of which remains pending, resulted from the Term Sheet between Nextel and the FCC looking to the transfer of NextWave's Licenses to Nextel.

 While courts have expressed reluctance to apply the doctrine of equitable estoppel to government in situations where government is acting in its sovereign capacity, the same rationale does not hold where, as here, government is acting in a commercial capacity. For example, in *Federal Deposit Insurance Corp. v. Sarandon,* Case No. 91 Civ. 5109, 1992 WL 36132 (S.D.N.Y. Feb. 19, 1992), the court made this distinction clear:

The rule of no estoppel against the government, as articulated in *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947), may be better described as a rule of no estoppel against the government when the government acts in its sovereign capacity rather than in a commercial capacity. When the FDIC sues to collect on a promissory note it is acting in a commercial and not in a sovereign capacity, and should be as vulnerable as any other litigant to principles of estoppel when it acts in a fashion that prejudices private citizens.

Similarly, the court in *Federal Deposit Insurance Corp. v. Harrison,* 735 F.2d 408 (11th Cir.1984), found that the FDIC was acting as a commercial creditor in its efforts to collect payment on certain notes and stated:

Proprietary governmental functions include essentially commercial transactions involving the purchase or sale of goods and services and other activities for the commercial benefit of a particular government agency. Whereas in its sovereign role, the government carries out unique governmental functions for the benefit of the whole public, in its proprietary capacity the government's activities are analogous to those of a private concern.

As stated by the Supreme Court in *Dickerson v. Colgrove,* 100 U.S. 578, 580, 25 L.Ed. 618 (1879):

The estoppel here relied upon is known as an equitable or estoppel in pais. The law upon the subject is well settled. The vital principle is, that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied to promote the ends of justice ....It accomplishes that which ought to be done between man and man ....

 The FCC argues that estoppel may apply to the government "only in those limited cases where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct," citing *Drozd v. I.N.S.,*

---

23. Statement of the Official Creditor's Committee in Support of, and Joinder in, Order to Show Cause Against FCC for Enforcement of the Automatic Stay with Respect to the Debtor's C and F Block Licenses, 4 at ¶ 7.

24. Debtor's Reply Brief in Support of Order to Show Cause Against the FCC for Enforcement of the Automatic Stay with Respect to the Debtors' C and F Block Licenses("Debtor's Reply Brief") at 27.

155 F.3d 81, 90 (2d Cir.1998) and *City of New York v. Shalala*, 34 F.3d 1161 (2d Cir.1994). However, these cases are readily distinguishable in that the plaintiffs there sought to estop government agencies from acting in their regulatory capacity. Where the government acts in a commercial capacity, as in the instant case, equitable estoppel is appropriate with or without findings of misrepresentation.

Indeed, the notion of "misconduct" is beside the point. What is important here is that the FCC acted one way for more than a year, and parties spent or loaned millions assuming that it meant what it said. Reliance was both reasonable and inevitable. Equitable estoppel will operate to prevent irrevocable harm from such a radical change of position as the January 12 Declaration.

██ As to waiver, "bankruptcy courts as courts of equity, should look with disfavor on contract forfeitures, especially if forfeiture would imperil a debtor's reorganization efforts. There is a tendency to overlook a failure to comply strictly with the terms of a contract when the parties by their conduct, have tolerated deviations in performance." *See In re Photo Promotion Assocs., Inc.,* 45 B.R. 878, 882 (S.D.N.Y.1985)

The law recognizes that the government, like any other contracting party, must give reasonable notice of any new compliance schedule if it chooses to unilaterally impose such a schedule. *See, e.g., Bailey Specialized Bldgs., Inc. v. United States,* 186 Ct.Cl. 71, 404 F.2d 355, 359 (1968) [25]. Such a waiver by one with authority will estop the government and the requirement cannot be suddenly revived to the prejudice of a party who has changed his position in reliance on the supposed suspension. *Gresham & Co. v. United States,* 200 Ct.Cl. 97, 470 F.2d 542, 555 (1972). *See also Miller Elevator Co., Inc. v. United States,* 30 Fed.Cl. 662, 688 (1994).

In recognizing that waivers are applicable against the government, the D.C. Circuit has held that where, as here

a government official has authority to waive the regulations allegedly violated [pursuant to its discretionary authority], "we look instead to the standards of waiver that would govern between private parties." ... Thus when, in the course of making an agreement, an official with power to waive a regulation that would bar the agreement acts in a way that signals to a private party an objective intent to waive the regulation, and the private party relies on that behavior, the government official is estopped from voiding the agreement on the basis of the regulation.

*Cinciarelli v. Reagan,* 729 F.2d 801, 807–08 (D.C.Cir.1984) (emphasis added). *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 98 F.Supp. 757, 766, *cert. denied,* 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951).

The FCC has the power and discretion to waive timely payment. The FCC acted in a way which said expressly and by implication that payments were suspended during NextWave's Chapter 11. NextWave and other parties acted in reliance.

It has been held that the FCC must consider the impact of its actions upon innocent creditors in assessing public interest with respect to FCC licenses. *Second Thursday Corp.,* 22 F.C.C.2d 515, 516 (1970); *LaRose v. FCC,* 494 F.2d 1145, 1146 & n. 6 (D.C.Cir.1974) ("[a]dministrative agencies have been required to consider other federal policies, not unique to

---

**25.** *See also* Glen T. Carberry & Phillip M. Johnstone, *Waiver of the Government's Right to Terminate For Default In Government Defense Contracts,* 17 PUB. CONT.L.J. 470, 478–81 (1988). In addition, implied waiver can occur when there is (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on failure to terminate and continued performance by him under the contract, with the government's knowledge and express or implied consent. *See DeVito v. United States,* 188 Ct.Cl. 979, 413 F.2d 1147, 1154 (1969).

their particular area of administrative expertise, when fulfilling their mandate to assure that their regulatees operate in the public interest"). In the present case, a decision to declare that the debtors' licenses were automatically cancelled one year ago, in the face of prospective full payment and immediate deployment, arbitrarily leaves the creditors and shareholders of these estates—representing $1.047 billion of claims—with little if any chance for recovery.

On the undisputed facts, the FCC has waived its "timely payment" requirement. Ultimately, NextWave must comply with the "payment in full" requirement, or the Licenses will be cancelled. But the debtors must be granted due process and their day in court under the Bankruptcy Code and a fair opportunity to pay their debt to the FCC in a confirmed Plan.

### IV. *No regulatory purpose countenanced by the governing statute is served by the "timely payment" requirement*

 The Court of Appeals has held that there is a "regulatory" aspect in the FCC's "payment in full" requirement. But no such aspect can be inferred with respect to the FCC's "timely payment" requirement. No rational explanation has been offered to show that timeliness has any objective other than pure debtor-creditor economics.[26]

What has been completely overlooked in the FCC's regulatory aspect contentions is that they conflict with the spirit and the letter of the agency's governing statute. The FCA does not mandate that the FCC should seek to extract maximum consideration for PCS licenses. To the contrary,

---

**26.** If the "timely payment" requirement served a *bona fide* regulatory objective, one must wonder what was the impact on that objective of the FCC's March and April 1997 orders indefinitely suspending all payments for C and F block licensees, the FCC's numerous regulations, orders, notices and instructions rescheduling and repeatedly changing payment deadlines, and the FCC's repeated

Congress has specified as one of four basic objectives of spectrum auctions "(C) recovery for the public of *a portion of* the value of the public spectrum resource." 47 U.S.C. § 309(j)(3)(C). The statute goes further and expressly precludes the FCC from basing regulatory determinations on revenue considerations. FCA § 309(j)(7)(A) and (B), under the heading "Consideration of revenues in public interest determinations," provides as follows:

### (A) Consideration prohibited

In making a decision pursuant to section 303(c) of this title to assign a band of frequencies to a use for which licenses or permits will be issued pursuant to this subsection, and in prescribing regulations pursuant to paragraph (4)(C) of this subsection, the Commission *may not base a finding of public interest, convenience, and necessity on the expectation of Federal revenues* from the use of a system of competitive bidding under this subsection.

### (B) Consideration limited

In prescribing regulations pursuant to *paragraph (4)(A)* of this subsection, the Commission *may not base a finding of public interest, convenience, and necessity solely or predominantly on the expectation of Federal revenues* from the use of a system of competitive bidding under this subsection.

47 U.S.C. § 309(j)(7)(A), (B); emphasis supplied.[27]

Paragraph (7)(A) applies to the FCC in its function of assigning or allocating spectrum, and it prohibits the FCC from exercising that regulatory function based on "the expectation of Federal revenues."

---

grant of waivers of payment defaults by other spectrum licensees. And how does that impact differ from the impact of the NextWave delay in payment?

**27.** The words "public interest," "convenience" and "necessity" obviously refer to the FCC's regulatory jurisdiction.

Paragraph (7)(B) governs the FCC in prescribing regulations pursuant to paragraph (4)(A). Paragraph (4)(A) provides as follows:

**(4) Contents of regulations**

In prescribing regulations pursuant to paragraph (3), the Commission *shall——*

(A) consider *alternative payment schedules* and methods of calculation, including lump sums or guaranteed installment payments, with or without royalty payments, *or other schedules* or methods that promote the objectives described in paragraph (3)(B), and combinations of such schedules and methods;

47 U.S.C. § 309(j)(4)(A); emphasis supplied.

Thus, Congress has ordered the FCC in Section 309(j)(4)(A) to "consider alternative payment schedules" to accomplish the legislative objectives, while in Section 309(j)(7)(B) Congress specifically prohibited the FCC from prescribing such regulations having a regulatory purpose "solely or predominantly on the expectation of Federal revenues." Certainly the statute contemplates that the FCC prescribe regulations respecting the installment payments called for by the legislation. But Congress has made clear that the expectation of revenue, *i.e.*, debtor-creditor economics, may not inform the FCC's regulatory equation. Precisely the same issue has arisen in the context of Section 362(b)(4) of the Bankruptcy Code, and the courts have uniformly drawn the distinction between administrative proceedings or actions that are regulatory in nature and those that are purely economic. *See* discussion under point I.D, above.

The FCC is bound by the statute from which it derives its jurisdiction. "It is a fundamental principle of American law that legislative statutes take precedence over conflicting administrative regulations." *Furlow v. U.S.*, 55 F.Supp.2d 360, 364 (D.Md.1999); *Caldera v. J.S. Alberici Const. Co.*, 153 F.3d 1381, 1383 (Fed.Cir.

1998) ("Statutes trump conflicting regulations"); *Wolf Creek Collieries v. Robinson*, 872 F.2d 1264, 1267 (6th Cir.1989) ("statutory language ... prevail[s] over inconsistent regulatory language"); *Bukala v. U.S.*, 854 F.2d 201, 203 (7th Cir.1988) ("an agency's interpretation of a statute ... cannot supersede statutory language"); *Johnson v. Heckler*, 769 F.2d 1202, 1212 (7th Cir.1985); *Pacific and Gas Elec. Co. v. U.S.*, 664 F.2d 1133, 1136 (9th Cir.1981) ("a regulation which operates to create a rule out of harmony with the statute is a mere nullity") (citing *Manhattan Gen. Equip. Co. v. C.I.R.*, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936); *U.S. v. Gordon*, 638 F.2d 886, 888 (5th Cir.1981)) ("whatever effect the agency regulation may have under other circumstances, it cannot supersede a statute applicable to those present here"). Nor can the FCC's regulations override the Bankruptcy Code. *U.S. v. Shumway*, 199 F.3d 1093, 1104–05 (9th Cir.1999); *Freeman v. City of Mobile*, 193 F.3d 1179 (11th Cir.1999) (agency cannot amend or supplant an act of the legislature).

Finally, one must ask whether there is any regulatory concern of such consequence that it should override the protections and policy considerations that lie at the very core of the Bankruptcy Code, or bar the jurisdiction of the Bankruptcy Court from enforcing the Code. What regulatory principle or public interest does the FCC invoke to outweigh the investment in these debtors of over $1 billion in debt and equity? What public policy is served by an act of the United States Government which violates basic notions of equity, due process and the Bankruptcy Code? What purpose is served by the FCC's relinquishment of over $4.7 billion for the C Licenses? How does the January 12 Declaration coexist with 47 U.S.C. § 309(j)(3)(A) looking to "rapid deployment" of spectrum "without administrative or judicial delays," or 47 U.S.C. § 309(j)(7)(A) and (B) prohibiting the FCC

from exercising its regulatory discretion "on the expectation of Federal revenues?"

The FCC cannot, either by its regulations or its interpretation of its regulations, supervene either the Federal Communications Act or the Federal Bankruptcy Code. Where those regulations or the agency's interpretation thereof conflict with either the FCA or the Bankruptcy Code, the will of Congress as expressed in the statutes must prevail.

## V. *The Circuit Court Decision does not address the issues presented on this motion*

Little need be said of the FCC's contention that the instant motion is governed by the Second Circuit Decision. Ultimately, it will be for the Court of Appeals to resolve this controversy, if the parties do not sooner settle it among themselves. In the meantime, the matter has been remanded to the Bankruptcy Court, and it is the responsibility of this Court to address the issues raised by this motion for review by the District and Circuit Courts.

The Court of Appeals rulings in respect of *NextWave I,* concerning subject matter jurisdiction, and *Nextwave II,* concerning fraudulent conveyance analysis, are the law of the case in these proceedings. But they do not touch upon the issues now before this Court, which arise from a subsequent event, the January 12 Declaration. Indeed, in remanding to the Bankruptcy Court, the Court of Appeals specifically referred to the possibility that the FCC might, in the future, seek to revoke the Licenses (*see* footnote 4, above).

The FCC relies upon the statement in the Circuit Court Decision that "the FCC made 'full and timely payment of the winning bid' a regulatory condition for obtaining and retaining spectrum license" (200 F.3d at 52). However, the very next sentence states: "This 'payment in full' re-

quirement has a regulatory purpose ..." (*id.*), and the entire balance of the Circuit Court Decision bearing on the question of regulatory purpose and subject matter jurisdiction is concerned solely with the "payment in full" requirement, which was the only matter before the Court. The Court of Appeals did not consider the question whether the "timely payment" requirement was invested with a regulatory purpose, because the FCC had never asserted any legal position based upon NextWave's failure to make post-petition payments on its pre-petition claims.

## *Conclusion*

For the foregoing reasons, the debtors' motion is granted. Counsel for NextWave will prepare forthwith an order consistent with this decision, fax it to counsel for the FCC for approval as to form (without prejudice to appeal) and submit it to this Court.

In accordance with the Court of Appeals' order of January 24, 2000, ruling upon the FCC's "Emergency Motion for a Stay of Bankruptcy Court Proceedings and Leave to File a Mandamus Petition," confirmation of any Plan of reorganization is stayed pending further order of the Court of Appeals. This Court admonishes the parties to cooperate in seeking expedited review on appeal in order that these Chapter 11 cases may be brought to a conclusion without unnecessary prejudice to the debtors' estates and the public interest entailed in further delay.

## APPENDIX A

### *The Alleged "Default"*

The FCC maintains that the debtors' Licenses automatically and retroactively ceased to exist at some point in late 1998 or January 1999 as a result of a "default" by NextWave citing 47 C.F.R. § 1.2110(f)(4)(iv).[28] Yet the FCC cannot

---

**28.** Subsection (iv) provides:

Any eligible entity that submits an installment payment after the due date but fails to

answer the most basic question as to the date of the default, the amount of the default, or the documents which might have apprised the debtors of the then impending default and forfeiture. As shown below, the answers to these questions are completely unclear.

### Notice of the Alleged Default

The first issue, reading from 47 C.F.R. § 1.2110(f)(4)(iv), is whether the debtors were ever given any notice of a default, because some form of notice of default, at the very least a declaration, is required by the phrase "will be declared in default."

At argument the FCC was extensively questioned as to whether any notice of default was given. Conceding that no notice was given to the debtors other than the January 12 Declaration, the FCC instead argued that it had published policy statements in its record which constructively gave notice of default and automatic cancellation under 47 C.F.R. § 1.2110(f)(4)(iv). (These published statements are addressed below.)

Moreover, the FCC also maintained that it was not required to specifically notify the debtor of the default, that under the regulation default occurred automatically despite the language "will be declared in default," and that it was incumbent on the debtors, before a "default" occurred, to seek an extension or waiver before any discretion of the FCC could be invoked. The FCC did, however, give other parties

notice of their payment defaults.[29] The FCC did not do so in this case. Its argument that the January 12 Declaration served as notice of default is little better than a post hoc rationalization for the failure to provide the same notice to the debtor it extended to other licensees. The fact is that the FCC simply ignored 47 C.F.R. § 1.2110(f)(4)(iv)'s direction that a default "will be declared."

### The Date of the Alleged Default

The FCC is unable to specify a date for the debtors' alleged default. The FCC's position in its objection to confirmation and in its brief is that a default occurred sometime (variously) in late 1998 or January 1999, while the January 12 Declaration only recites a delinquency more than 90 days after July 31, 1998. The FCC relies on the provisions of the installment payment "Restructuring Orders" to support its vague assertion of a default date at some point in January 1999.

To appreciate these Restructuring Orders, some history of the regulatory sequence is necessary. On March 31, 1997, the FCC issued an order which suspended the installment payment obligations of C block licensees "until further notice," although interest continued to accrue during the suspension. *In the Matter of Installment Payments for PCS Licenses*, 12 F.C.C.R. 17325, 1997 WL 144207 (1997). A corresponding suspension was issued for F block licensees on April 28, 1997.

pay any late fee, interest or principal at the close of the 90–day non-delinquency period and subsequent automatic grace period, if such a grace period is available, *will be declared in default*, its license will automatically cancel, and will be subject to debt collection procedures. (emphasis supplied).

29. *See, e.g., In Re Roberts–Roberts & Assocs.*, 12 F.C.C.R. 1825, 1997 WL 43121 (Feb. 4, 1997) (granting waiver of downpayment rules for incorrect payment after notice of delinquency issued); *In Re Southern Communications Systems, Inc.*, 12 F.C.C.R. 1532, 1997 WL 43127 (Feb. 4, 1997) (waiver of late pay-

ment default where payment made one day late and upon notice of delinquency); *In Re Longstreet Communications Int'l., Inc.*, 12 F.C.C.R. 1549, 1997 WL 43114 (Feb. 4, 1997) (waiver of late payment default where payment made nine days late and upon notice of delinquency); *In Re RFW, Inc.*, 12 F.C.C.R. 1536, 1997 WL 43097 (1997) (waiver of late payment default where payment made six days late and upon notice of delinquency); *In Re Wireless Telecommunications Co.*, 12 F.C.C.R. 1544 (Feb. 4, 1997) (waiver of late payment default where payment made two days late and upon notice of delinquency).

The suspension was lifted in a September 25, 1997 "restructuring" order, *In the Matter of Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licensees,* 12 F.C.C.R. 16436, 1997 WL 643811 (Sept. 25, 1997) (the "First Restructuring Order"), and modified in two subsequent orders, *In the Matter of Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licensees,* 13 F.C.C.R. 8345, 1998 WL 130176 (March 23, 1998) (the "Second Restructuring Order"), and *In the Matter of Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licensees,* 14 F.C.C.R. 6571, 1999 WL 183822 (March 31, 1999) (the "Third Restructuring Order", collectively the three are referred to as the "Restructuring Orders"). The First Restructuring Order instituted the resumption of installment payments for C and F block licensees as of March 31, 1998 and instituted an automatic 60–day grace period (payment date of May 30, 1998). 12 F.C.C.R. 16436 at ¶ 25. The First Restructuring Order further set out three options to resumption of payments originally due for C block licenses, with an election to be made by June 8, 1998. The Second Restructuring Order modified the options available to C block licensees, changed the automatic 60–day grace period to a 90–day period, and reset the payment resumption date from March 31, 1998 to a date 90 days after publication of the Second Restructuring Order in the Federal Register, with a 5% late payment fee due for amounts paid within this period. 13 F.C.C.R. 8345 at ¶¶ 6, 15. The Third Restructuring Order did not alter these due dates.

In a confusing series of rulings, the FCC delayed the issuance of a final installment payment resumption date, finally setting it for July 31, 1998. 13 F.C.C.R. 7413, 1998 WL 180790 (April 17, 1998) ("Installment payments for broadband PCS C and F block licensees will resume on July 31, 1998. On that date, licensees are required to pay accrued interest from April 1, 1998, through and including July 31, 1998, plus one-eighth of their Suspension Interest. Payments received after July 31, 1998, but on or before October 29, 1998, must include a late payment fee equal to 5% of the amount that was due on July 31, 1998.").

In the meantime, amendments to 47 C.F.R. § 1.2110 became effective on March 16, 1998 which both modified and incorporated some of the terms of the First and Second Restructuring Orders. However, the FCC only released an interpretive guidance document some six months later in the September 18, 1998 *Wireless Telecommunications Bureau Provides Guidance on Grace Period and Installment Payment Rules,* 13 F.C.C.R. 18213, 1998 WL 639381 (September 18, 1998) (the "Guidance Notice"). The Guidance Notice instructs:

> The Commission recently amended 47 C.F.R. § 1.2110 to provide that licensees that do not make an installment payment on or before a due date are automatically granted a 90 day grace period ("non-delinquency period") and assessed a late fee equal to 5 percent of the missed installment payment ("late fee"). *If remittance of the missed installment payment and the 5 percent late fee is not made on or before expiration of the non-delinquency period, a second 90 day period ("grace period") is automatically granted and an additional late fee equal to 10 percent of the missed installment payment is assessed.* Licensees are not required to make an application to the Commission to receive the non-delinquency period or the grace period. Furthermore, licensees are not required to remit the 5 percent late fee prior to

the expiration of the non-delinquency period to be eligible for the grace period. Late fees accrue on the first business day after a missed installment payment and upon the expiration of the non-delinquency period.

Specifically, under the revised rule, a licensee must pay the missed installment payment, the 5 percent late fee, the 10 percent late fee (if applicable) and any lender advances the licensee may be obligated to pay (including but not limited to Uniform Commercial Code filing fees and attorney fees for debt collection). This payment must be made in full, in one payment, before the expiration of the non-delinquency period or grace period. Payments made during a non-delinquency period or a grace period shall be applied in the following order of priorities: (i) lender advances (ii) late fees (iii) interest payable and (iv) principal owed.

*Any licensee that becomes more than one-hundred eighty (180) days delinquent on an installment payment shall be in default, and the license shall automatically cancel without further action by the Commission. In that event, the debt shall be transferred to the Department of Treasury for collection subject to the Debt Collection Improvement Act of 1996.*

Payment due dates for missed installment payments and accompanying late fee(s) are independent of the regular installment payment schedules. Licensees should be aware that the late payment provisions are calculated on a 90 calendar day basis, while installment payments are based on a quarterly payment schedule. Quarterly payments may cover up to 92 calendar days, depending upon the month in which the payment is due. In many instances, missed installment payments and accompanying late fee(s) may be due before the next quarterly installment payment. Payments of missed installment payments and accompanying late fee(s) must be made simultaneously and in a timely manner. Partial payments will not be sufficient to avoid default. (emphasis supplied)

According to the Guidance Notice, the operative grace period for installment payments should be 180 days from the modified resumption date (July 31, 1998), or January 28, 1999. However, the Guidance Notice was not released until well after the April 17 revision of the resumption date to July 31, 1998. Assuming that a licensee would have found this public notice, any licensee in September of 1998 would have faced interpretive guidance relating to a potential default date of July 31, 1998, established five months earlier on April 17 and extending the previous due date of March 31 which itself was established on March 23 in the Second Restructuring Order, only to find himself within a grace period extending until October 28 (then only a month or so away), which was established by implication on March 16 in the amendments to 47 C.F.R. § 1.2110 and could only be determined with reference to the April 17 order, with a possible second grace period assessing a doubled penalty rate to run for an additional 90 days.

Of course, the foregoing analysis may not accord with the FCC's contemporaneous or post hoc interpretations of its regulations, or indeed possibly some other regulations this Court has not found, even after its own diligent computer search through the often vague and conflicting flotsam of FCC releases.

It certainly does not accord with the representations made to this Court by the FCC. The FCC in its memorandum claims October 31, 1998 as the deadline, citing to *In the Matter of Amendment of the Commission's Rules Regarding Installment Payment for Personal Communications Services (PCS) Licenses, Order on Consideration of Second Report and Order,* 13 F.C.C.R. 8345 at ¶¶ 15, 21–30, 1998 WL 130176 (March 24, 1998). Yet, this date is completely inconsistent, from this Court's

reading, with the later-issued Guidance Notice. The only thing that is clear is that, whatever the putative default date was, it was a moving target. As daunting as it has been for this Court to attempt to reconstruct this sequence well after the fact, it would have been beyond perplexing for a licensee at the time to fix any reasonable notion of what obligation was due when.

Not surprisingly, in this contested matter the FCC has been unable to articulate any date upon which the debtor's installment obligations were due, even noting that their calculation of January 1999 was in part informed by the 60–day extension provision of Bankruptcy Code Section 108. Subtracting 60 days from January 1999 results in some date in November 1998, for which no support exists in the regulations. Add to this the fact that the debtor filed its petition in June of 1998, in the midst of miasma of conflicting, shifting deadline amendments, and there is little surprise that FCC counsel at the hearing was able to identify a date certain for a default.

Even assuming, say, that January 28, 1999 were the correct date for the expiration of any applicable grace period, it does not follow that a "default" occurred. Payment obligations were suspended until July 31, 1998, but the debtors filed their petition on June 8, 1998. Thus the suspension was in effect when the debtor commenced this case. No obligation was then due. Under the grace period regulations, no obligation would have been due, this Court assumes in the absence of any other cogent explanation, until January 28, 1999. The FCC's claimed default date calculation, which falls sometime in either of October or November 1998 excluding any effect of Section 108, is utterly inconsistent with its guidance documents which would have putatively granted grace periods until January 28, 1999. If that is indeed the FCC's "rough" calculation, the debtors cannot have been in default when the FCC

claims it to have been. The debtors' obligations on the Notes were incurred as of January 3, 1997 (but executed on February 19, 1997). The March 31, 1997 suspension order suspended any installment payment obligations and they were not resumed until July 31, 1998 (at the earliest, although interest continued to accrue). Thus, the putative default amounts, if indeed they can be calculated, were entirely post-petition. The legal effect of any putative default or automatic cancellation issuing in the post-petition period is discussed in the main body of this decision.

### The Amount of the Alleged Default

What was the amount of the debtor's alleged default in late 1998 or January 1999? There is no answer.

The only documentation of what might have been due, contained in a supplemental submission by the FCC, is a statement to NextWave dated May 26, 1998 of total interest due of $2,474,901.66 for payments comprising five payments due from 4/30/97 through 3/31/98. How these payments could have been "due" as of May 26, 1998 while the various suspensions and grace periods were in effect is not at all clear, especially in light of the April 17, 1998 extension of the resumption date to July 31, 1998.

The Restructuring Orders, the March 16, 1998 amendment to 47 C.F.R. § 1.2110 and the Guidance Notice do give some guidance as to method of calculation, but the guidance is hopelessly complex and confusing. See First Restructuring Order ¶¶ 25–27, (requiring "all payments due and owing on and after March 31, 1998 be made in accordance with the terms of the licensee's Note, associated Security Agreement, and the Commission orders and regulations," with all interest accrued over the suspension period becoming due and payable over a two-year period in one-eighth of the amount of suspension period interest payable with each regular installment payment until paid). As to regular installment payments, the First Restructuring order provides:

We conclude that it could place a significant burden on licensees to require payment of the entire amount of the Suspension Interest on March 31, 1998. We therefore require that broadband PCS C and F block licensees submit one-eighth of the Suspension Interest on March 31, 1998, and one-eighth of the Suspension Interest with each regular installment payment made thereafter until the Suspension Interest is paid in full. After March 31, 1998, payment due dates will conform to those indicated in the Note(s) executed by the licensees. While the first regular installment payment next made after March 31, 1998 will be pro-rated to account for the resumption of payments on March 31, 1998, all regular installment payments thereafter will be in the amounts shown on the amortization schedule attached to and made a part of each Note, as amended, plus the applicable payments of Suspension Interest. For example, for those licensees granted in September, 1996 whose regular installments occur on March 31, June 30, September 30, and December 31 of each year, the next regular payment due after March 31, 1998, will be due on June 30, 1998, and will include the amount of interest accrued from April 1, 1998, through and including June 30, 1998, plus one-eighth of the Suspension Interest. The next regular payment will be due on September 30, 1998, and will be due in the amount shown on the amortization schedule attached to the Note (i.e., interest from July 1, 1998, through and including September 30, 1998), plus one-eighth of the Suspension Interest. Regular payments will continue on each and every December 31, March 31, June 30, and September 30 thereafter until the Note is paid in full. For these licensees, the payment due on December 31, 1999, will be the last payment due that includes any amortized Suspension Inter-

est. All payments after that date will continue in accordance with the terms of the amortization schedule attached to the Note executed by the licensee.

*Id.* at ¶ 27. The Second Restructuring Order made the following changes:

... we will extend to 90 days the automatic 60–day non-delinquency period applicable to payments due on the payment resumption date. As mentioned above, the Commission's rules allow a 90–day non-delinquency period for all other installment payments. Although we stated in the Second Report and Order that a shorter non-delinquency period was justified in light of the one-year payment suspension, we now believe that it is preferable to make the length of that non-delinquency period consistent with our rule for all other payments .... Consistent with our rule for all other payments, payments made within this 90–day non-delinquency period will be assessed the 5 percent late payment fee that we recently adopted.... Therefore, there will be no subsequent automatic grace period for licensees that fail to make payment within the 90–day non-delinquency period. Subsequent payments, due after the initial resumption payment, will be subject to the rules adopted in the Part I Third Report and Order.[30]

27. Under this plan, the Suspension Period (as defined in the Second Report and Order) will still end on March 31, 1998. All interest accrued from the date of license grant through March 31, 1998, (i.e., Suspension Interest) will continue to be payable over eight equal payments. Interest accrued from April 1, 1998, through the payment resumption date will be due on the payment resumption date, in addition to one-eighth of the Suspension Interest.... In addition, we instruct the Bureau to modify the payment schedule so that all C and F block installment payments will be due on a

---

**30.** This refers to the March 16, 1998 amendments to 47 C.F.R. § 1.2110, 63 FR 2315.

quarterly basis, beginning on the payment resumption date.

Second Restructuring Order at ¶¶ 25–27. The March 16 amendments to 47 C.F.R. § 1.2110, as articulated in the Guidance Notice, issued only well after the extended resumption date of July 31, 1998, once again changed the grace periods along with any applicable charges:

> The Commission recently amended 47 C.F.R. § 1.2110 to provide that licensees that do not make an installment payment on or before a due date are automatically granted a 90 day grace period ("non-delinquency period") and assessed a late fee equal to 5 percent of the missed installment payment ("late fee"). If remittance of the missed installment payment and the 5 percent late fee is not made on or before expiration of the non-delinquency period, a second 90 day period ("grace period") is automatically granted and an additional late fee equal to 10 percent of the missed installment payment is assessed. Licensees are not required to make an application to the Commission to receive the non-delinquency period or the grace period. Furthermore, licensees are not required to remit the 5 percent late fee prior to the expiration of the non-delinquency period to be eligible for the grace period. Late fees accrue on the first business day after a missed installment payment and upon the expiration of the non-delinquency period.
>
> Specifically, under the revised rule, a licensee must pay the missed installment payment, the 5 percent late fee, the 10 percent late fee (if applicable) and any lender advances the licensee may be obligated to pay (including but not limited to Uniform Commercial Code filing fees and attorney fees for debt collection). This payment must be made in full, in one payment, before the expiration of the non-delinquency period or grace period. Payments made during a non-delinquency period or a grace period

shall be applied in the following order of priorities: (i) lender advances (ii) late fees (iii) interest payable and (iv) principal owed.

Guidance Notice, *supra.* Moreover, the Guidance Notice stated:

> Licensees should be aware that the late payment provisions are calculated on a 90 calendar day basis, while installment payments are based on a quarterly payment schedule. Quarterly payments may cover up to 92 calendar days, depending upon the month in which the payment is due. In many instances, missed installment payments and accompanying late fee(s) may be due before the next quarterly installment payment.

*Id.* In other words, although suspension period interest was to be paid along with regular installment payments (when the obligation resumed, but upon which date is not altogether clear), *see* the quoted provisions of the Restructuring Orders, *supra,* the Guidance Notice appears to say that some payments may have been due before others.

Reading through this sequence of FCC pronouncements, one is unable to divine how to calculate what payment would have been due, even assuming that a default date could be determined, which is itself problematic. It is also unclear whether the statement in the Second Reconsideration Order (dated March 24, 1998) that "there will be no subsequent automatic grace period for licensees that fail to make payment within the 90–day non-delinquency period" conflicts with the March 16 amendments to 47 C.F.R. § 1.2110 (*see* 63 FR 2315 at 2346), as announced in the September 18, 1998 Guidance Notice, providing for an second automatic grace period, particularly given that the resumption date was reset to July 31, 1998.

Moreover, and significantly, since the FCC cannot determine the amount due, then it can hardly satisfy the necessary precondition of 47 C.F.R. § 1.2110(f)(4)(iv) that "[a]ny eligible entity that submits an installment payment after the due date but

fails to pay any late fee, interest or principal at the close of the 90–day non-delinquency period and subsequent automatic grace period...." There is no calculus of what amounts were due, and no way to determine on a given date whether any late fee, interest payment, interest or principal in fact was due, or whether the alleged default was attributable to late fees, interest or principal.